[No. A110940. First Dist., Div. Two. July 20, 2006.]

JOE ABOUAB et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

COUNSEL

Wayne Lesser and Michael Mendelson for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Julie Van Nostern, Chief Tax Attorney, and Owen J. Clements, Chief of Special Litigation, for Defendants and Respondents.

OPINION

**RICHMAN, J.**—Appellants here, petitioners below, are Joe Abouab, Karl Plischke, and Terri Chantrelle (Petitioners). They filed a mandamus action against the City and County of San Francisco, its recorder, tax collector, and assessor (when referred to collectively, the City), seeking to compel the City to investigate an unreported change in ownership of a San Francisco property and reassess it. The reassessment happened, the upshot of which, after many years and many proceedings, was an increase in property tax revenue of some $64 million.

Petitioners made a motion seeking a determination that they are entitled to attorneys' fees in connection with that $64 million. The trial court rejected all of the theories on which Petitioners' fee claim was based, and denied them any fees. We, too, reject their claim and affirm.

## I. THE BACKGROUND

### A. *Introduction*

The appeal arises out of the 1993 reassessment of a San Francisco property called One Market Plaza, a commercial office building and nearby parking garage (One Market Plaza or the property). The reassessment was triggered under article XIIIA of the California Constitution (Proposition 13), following a determination that there had been a change in ownership. The change in ownership was not a simple, straightforward transaction by any means, but a complex series of transactions beginning in 1986, involving The Equitable Life Assurance Company of the United States (Equitable), the International Business Machines Retirement Plan Trust Fund (Plan), and various "separate accounts," highly regulated transactions authorized by the insurance laws of both California and New York, where Equitable was incorporated. The transactions are described in detail in the recent opinion by Division Five of this court, *IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291 [32 Cal.Rptr.3d 656], and such detail is not necessary to an understanding of the issue here. Suffice to say that the reassessment came about only after an extensive investigation, review of thousands of pages of documents, a federal lawsuit, a lengthy hearing before the Assessment Appeals Board (AAB), two lawsuits in the San Francisco Superior Court, and more. While the ultimate outcome of the reassessment is still not finally determined, the net effect is, as of now, some $64 million plus in the City coffers.

### B. *The Inkling of the Change in Ownership and the Request for Legislation*

Attorney Wayne Lesser (Lesser), one of Petitioners' lawyers, represented the defendants in a declaratory relief action involving a "small sandwich shop" in One Market Plaza.[1] Those defendants were Joseph Abouab, one of

---

[1] The underlying facts, including the results of many of the legal proceedings described, are derived almost exclusively from declarations filed in connection with Petitioners' motion for attorneys' fees, which included five declarations filed on behalf of Petitioners and two on behalf of the City. By far the most extensive declaration was that of Petitioners' attorney Lesser, which was 52 pages in length with 77 exhibits, many of them quite lengthy.

While Lesser's declaration was called that, it contained much argument, many conclusions, and myriad other inadmissible material, none of which was ever ruled on. Rather, Lesser's

the Petitioners, and his wife. According to Lesser, as part of his "due diligence" he investigated a fictitious business filing pertaining to the owner of the property, to learn that the filing had expired. This led to a successful demurrer, which led to a new complaint alleging a fictitious business certificate naming a new owner. Further investigation led Lesser to uncover other names and, to him, "confusion," the initial "clue the ownership of [One Market Plaza] had changed."

In late August 1991 a meeting was held to attempt to settle the declaratory relief action. This meeting was attended by Lesser, Abouab, and four others, one of whom refused to identify his principal or even answer why he was there. According to Lesser, this person told Abouab that the building owners wanted him out, that there would be no settlement, and that they would "bury him." This made Lesser even "more resolute."

Though the declaratory relief action continued, Lesser's representation of Abouab terminated by October 1991. Lesser nevertheless continued to investigate the change in ownership at One Market Plaza, and along the way apparently developed various sources, including a "confidential source" within Equitable and other "street sources."

Meanwhile, beginning in October 1991, Lesser started communications with the San Francisco Mayor's Office and City Attorney's Office to inform

---

declaration was before the court against the background of a joint status conference statement filed in preparation for the motion, in which "San Francisco's position" was set forth, seeking "the Court's guidance concerning its [i.e., the City's] opposition to the attorneys fee motion, in order that the opposition be submitted in the form most useful to the Court." After noting the volume of materials filed by Petitioners, the City's position asserted that Petitioners' "moving papers contain innumerable factual assertions and a great deal of speculation about events surrounding the reassessment of One Market Plaza and the ensuing litigation, which have taken [*sic*] over the past dozen years. [¶] San Francisco takes issue with a large number of Petitioners' factual assertions, and nearly all of the arguments and conclusions that Petitioners draw from those assertions. Moreover, many of the materials submitted by Petitioners are not admissible. But San Francisco also believes that most of the factual assertions and arguments made by Petitioners are not material to the proper resolution of the attorneys fee issue. Rather than dispute points that are not material to the attorney fee issue for the sake of setting the record straight, San Francisco would prefer to submit a more limited opposition that addressed the key issues. San Francisco would like to submit such an opposition based on the understanding that its failure to rebut particular factual assertions or insinuations in the moving papers will not in any way be taken as an admission of their accuracy."

Thus, and because the trial court would go on to further refine the issue before it as described in detail hereinafter, the City's opposition did not address numerous factual and legal issues raised by Petitioners' application. Nevertheless, the declarations are essentially all we have, and we use them accordingly.

them about the "possible change of ownership of a large downtown building." Lesser did not identify the building.[2] In Lesser's words, he "sought to interest them in potential legislative action in the nature of a local whistle blowers (*qui tam*) statue styled after California Government Code section 12652 (the Cal. *Qui Tam* statute) to benefit Mr. Abouab and the City." There was interest in such legislation, as evidenced by various memoranda and draft legislation in the record. However, for reasons not explained in the record, the board of supervisors did not pass the ordinance, and apparently in early October 1992, Lesser was advised of that fact. Days later, he filed the within petition.

## C. *The Writ Proceeding*

On October 8, 1992, a petition for writ of mandamus was filed on behalf of Petitioners, allegedly taxpayers of the City and County of San Francisco.[3] The petition sought to compel the City to investigate an unreported change of ownership at One Market Plaza and to reassess the property. The petition was followed shortly by a first amended petition, filed October 20, 1992, which sought the same relief as the original, on the same theory, apparently only adding the AAB as a respondent and some exhibits. Both petitions sought attorneys' fees under former section 7.700 of the Charter of the City and County of San Francisco (Charter) and the common fund doctrine.

As Petitioners stipulated below, in a stipulation filed over 12 years after the petition, prior to filing their petition they did not discuss the basis for their position with the assessor's office or share any information concerning the unreported change of ownership—not even the identity of the property. The scope of the stipulation is broad, as the facts "deemed as conclusively established" included the following:

---

[2] While the record is not extensive, apparently sometime in late 1990 or early 1991 the City had received a "tip" regarding some possible involvement of the Plan in One Market Plaza. An appraiser named Eugene Barron was assigned to look into the matter and, according to a short memorandum he prepared, contacted an Equitable representative and was told that there were no unrecorded documents giving the Plan any ownership rights in the property. Barron apparently accepted this representation at face value and concluded that there was no need for further action to investigate the tip. This tip was referred to in a stipulation executed in connection with the motion below, where the parties stipulated that "1. Petitioners' moving papers refer to a tip, made in or around 1991, from an unidentified person to former Assessor Richard Hongisto, concerning a possible change of ownership at One Market Plaza. (Lesser Declaration, at p. 19, n. 10.) Neither Petitioners nor their counsel know who this source was, nor did they play any role in causing this unidentified person to contact Assessor Hongisto. Neither Petitioners nor their counsel were aware that this contact had taken place at the time that they filed their original writ."

[3] We say allegedly because, other than a reference to Abouab being the owner of a sandwich shop in San Francisco, there is no evidence in the record whatsoever about Petitioners, no declarations from them, no testimony about them, nothing.

"2. Petitioners' moving papers refer to 'a confidential source within The Equitable who was Lesser's client . . . .' Petitioners and their counsel have declined to identify this person to Respondents, based on a claim of privilege. The identity of this source was not disclosed to Respondents during the course of their investigation of the One Market Plaza matter, nor was it made public in any other way. . . .

"3. Petitioners' moving papers refer to numerous 'street sources' that counsel for Petitioners developed during his investigation of the One Market Plaza matter . . . . Neither Petitioners nor their counsel ever disclosed the identity of any of these sources to the City before the end of the AAB proceedings in this matter. None of these sources testified at the AAB proceedings or provided any documentary evidence that was submitted into the record in front of the AAB.

"4. Petitioners' moving papers refer to their efforts to have a local tax reward ordinance adopted by the San Francisco Board of Supervisors. . . . During discussions concerning this proposed ordinance, counsel for Petitioners told representatives of San Francisco that there was a possible unreported change of ownership affecting one or more large downtown properties in San Francisco. During these discussions, neither Petitioners nor their counsel identified the property or properties in question nor did they request any representative of San Francisco to take any action with respect to the One Market Plaza Property.

"5. Prior to serving their writ action on San Francisco, neither Petitioners nor their counsel provide [*sic*] any information to any City employee that identified One Market Plaza as the property involved in the unreported change of ownership.

"6. Prior to serving their writ action on San Francisco, neither Petitioners nor their counsel made any effort to discuss the issues raised in their writ petition with any City employee, or to resolve those issues without resorting to litigation."

Petitioners arranged to serve the petition at a meeting at the office of Deputy City Attorney Burk Delventhal. The meeting was attended by three attorneys on behalf of Petitioners, Lesser, Michael Mendelson, and John Doherty, and two attorneys for the City, Delventhal and Claude Kolm, head of the city attorney's tax division. According to Lesser, they explained the nature of the petition and offered to cooperate with the City, at which point Delventhal telephoned Steven Dunbar of the assessor's office, to ask that he join the meeting. And, according to Lesser, at the end of the meeting Delventhal reportedly "jumped up and said 'let's get them' " and "expressed

appreciation and delight for the potential joint efforts to follow." Efforts followed all right, but hardly joint.

### D. *The Assessor's Investigation and the Reassessment*

Following receipt of the information from Petitioners' counsel, the assessor's office began its investigation into the matter, under the supervision of Chief Assistant Assessor Dunbar, who was second in command of the San Francisco office and with extensive experience involving change in ownership issues.[4] Dunbar began almost immediately, and on October 30, 1992, acting under the statutory power of Revenue and Taxation Code sections 441, subdivision (d), and 470, he sent letters with document demands to the Plan, Equitable, and related entities concerning the ownership of One Market Plaza.

As Dunbar began his investigation, on November 2, 1992, the city attorney wrote to Lesser, advising "that the Assessor's office has begun prompt action to investigate the change in ownership of One Market Plaza, and based on the results of this investigation, the Assessor, the Tax Collector, and the Recorder will seek to recover such taxes as the facts indicate are due. [¶] As a result, we believe there is no longer cause for this suit or for further actions to be taken which will only be duplicative of the Assessor's actions and could run up attorneys' fees to be paid for from City funds. Consequently, I request that you take action to dismiss the suit. If you do not do so and instead seek to initiate discovery, San Francisco will move for a protective order unless it is assured that you will not seek attorneys' fees for time spent on the discovery."

Lesser responded by letter dated November 17, 1992, in which he expressed his shock at the City's position and opined that the taxpayers' interests would be best served by Petitioners' continued involvement. In the words of Lesser's declaration, his letter "informed the City that neither Petitioners nor counsel would 'get lost' or abandon their duty to their taxpayer class to confer the maximum financial benefits to the citizens of San Francisco." As Doherty's later declaration would describe the situation, shortly after the petition was filed, "the City Attorney's attitude towards Petitioner suddenly . . . became hostile and uncooperative, and remained that way for about eight years, approximately."

Dunbar's document demands produced a massive amount of material in response, the Plan alone producing some 26 boxes of documents relating to One Market Plaza. These boxes were delivered to Dunbar's office, and he

---

[4] Dunbar had been the Assessor of Mariposa County for 14 years. He was also involved in the implementation of Proposition 13, working closely with other assessors statewide and with the State Board of Equalization.

personally went through each of them, flagged those that seemed most relevant to the change of ownership determination, and had copies of many of those documents sent to the city attorney's office for their review. Equitable, too, produced many boxes of documents, which Dunbar and deputy city attorneys reviewed and copied.[5] This investigation consumed half of Dunbar's working time for some three to four months.

According to Dunbar, these confidential materials provided the key evidence, the foundation of what would be his conclusion that the 1986 separate account transaction constituted a change of ownership of One Market Plaza under California property tax law. Dunbar's review of the documents revealed, for example, that as a result of the separate account transaction, the Plan gained the right to profit from the rents received on the property; the Plan could also require that the property be sold, and was the party that would gain or lose depending on whether the property's value had increased or decreased. The Plan also gained the right to manage the property and to choose tenants for it. And the Plan was responsible for the expenses of the property and had control over decisions of how much to spend on renovations. In short, the Plan was the owner of the property in everything but name which, in Dunbar's view, compelled the conclusion that the 1986 separate account transaction had been a reassessable change in ownership of One Market Plaza.

Dunbar discussed his intent to reassess the property with attorneys in the city attorney's office, who told him they would support his decision. Dunbar had the property reassessed, based on a 1986 base year value, and on March 10, 1993, the assessor's office notified One Market Plaza Corporation (the entity formed to manage the property) that the property would be reassessed because the 1986 separate account transaction constituted a change in ownership under California property tax law. In March and April 1993, the assessor's office sent out notices of supplemental and escape assessments on the One Market Plaza property, with the new 1986 base year value based on the purchase price that had been paid by the Plan for the property during the 1986 transaction.[6]

Following more investigation, in November 1994, the assessor's office increased the assessed value of the property based on the income method rather than fair market value. The assessor also imposed a 25 percent penalty under Revenue and Taxation Code sections 503 and 504. Thus began the dispute between the City and the Plan that continues to this day.

---

[5] The materials produced were confidential, and Dunbar did not share them with anyone other than attorneys at the city attorney's office.

[6] According to Lesser, Dunbar's reassessment was only for an 81 percent ownership basis, not 100 percent, and he so advised the assessor and others. On May 10, 1993, the assessor reassessed the property at the 100 percent rate.

### E. *The Stay of the Writ Proceeding*

Meanwhile, as Dunbar was investigating the issue that was the subject of the petition, on December 2, 1992, the Plan and Equitable filed motions for judgment to, as Lesser put it, "end the proceedings, eject [Petitioners] and obtain Judgment" in their favor. The motions were based in part on the grounds that the petition was moot because the assessor was in fact doing all that the petition sought and that Petitioners had failed to exhaust their administrative remedies.

These motions came on for hearing before Judge Stuart Pollak on December 17, 1992. Though Judge Pollak rejected the exhaustion of administrative remedies argument, by order dated January 29, 1993, he ordered the entire action stayed. The stay was ordered before any discovery had occurred—indeed, before the matter was even at issue.

### F. *The Dismissal of the Writ Proceeding*

The matter was apparently quiescent for some time, until September 15, 1993, when Petitioners filed a motion for leave to file a supplemental and second amended petition seeking to compel the assessment of a fraud penalty. On September 23, 1993, the Plan and Equitable filed oppositions to Petitioners' motion and renewed their motions for judgment, again arguing the petition was moot because the assessor had taken action. Judge Pollak heard these motions, and on November 16, 1993, entered an order granting Petitioners leave to amend and denying the motions for judgment.

On November 29, 1993, Petitioners filed their second amended petition, which was not responded to by the City for over a year. Finally, on January 9, 1995, the City filed a demurrer to the second amended petition, arguing that it was barred by Revenue and Taxation Code section 4807, failed to plead presuit notification, improperly sought to compel discretionary actions, and failed to allege an actual controversy. At the same time, the Plan and Equitable filed motions for judgment on the petition, claiming that the petition was moot, as the assessor's office had taken every action that Petitioners had sought. Petitioners filed a motion to stay.

The matters came on for hearing on February 3, 1995, again before Judge Pollak. This time Judge Pollak granted the motions for judgment and dismissed the petition as moot. Doing so, however, Judge Pollak expressly retained jurisdiction to determine whether Petitioners should receive an award of attorneys' fees, and extended the time to seek such an award until all challenges to the assessments had been resolved.

We digress from the chronology to note that Petitioners contend that Judge Pollak has ruled or found that Petitioners were entitled to attorneys' fees if

certain conditions were met. Such contention is belied by the record. Judge Pollak's remarks throughout the argument on the motions all indicated that no decision was made on the attorneys' fee issue, illustrated, for example, by his express statement that he did not know whether there was an "entitlement" to fees, followed shortly by the caveat, "should I do so." And were there any doubt on this—and there is not—it is dispelled by the succinct holding in Judge Pollak's order: "The Court has made no determination at this time as to who or which party to this proceeding is the prevailing party or whether attorneys' fees and costs should be awarded or any other issue which must be determined in connection with the attorneys' fee motion."

### G. *The Federal Case*

In January 1995, the trustee of the Plan filed a lawsuit in the United States District Court, Northern District of California. It was *Chase Manhattan Bank, N.A. v. San Francisco* (N.D.Cal., June 28, 1995) No. C95-0004 (VRW), and in it Chase sought, inter alia, a declaration that the City's attempt to reassess the property was preempted by ERISA (29 U.S.C. § 1001 et seq.) (Employee Retirement Income Security Act of 1974). The City filed a motion to dismiss for lack of subject matter jurisdiction, which the district court granted on July 6, 1995. Chase appealed to the Ninth Circuit Court of Appeals, which affirmed (see *Chase Manhattan Bank, N.A. v. San Francisco* (9th Cir. 1997) 121 F.3d 557, cert. den. 524 U.S. 945 [141 L.Ed.2d 727, 118 S.Ct. 2358] (1998)), the effect of which was a determination that the federal suit was properly dismissed.[7]

### H. *The Assessment Appeals Board Proceedings*

Following the defeat in the federal action, Equitable and One Market Plaza Corporation filed applications with the AAB to challenge the reassessment and the fraud penalties. Apparently contemporaneously, and before the AAB hearing began, the Plan and the City began settlement negotiations, which led to a proposed settlement with the following essential terms: the Plan would not contest the assessor's change of ownership determination; the parties would stipulate to values for the property that were somewhat lower than those that had been assessed in 1994; and the City would refund the fraud penalty that had been imposed.

Petitioners' counsel vigorously opposed that settlement and correspondence ensued between and among the AAB, the city attorney, and the attorney for the Plan about that opposition and the settlement. The result of all this was a

---

[7] According to Lesser, Petitioners sought to appear as amicus curiae in the federal case; the City refused their request; and District Judge Walker granted their request for "amicus status." No such amicus curiae filings appear in the record.

notification from the AAB that it rejected the settlement. Subsequent negotiations led to another stipulated settlement; Petitioners' attorneys again interposed objections; again the AAB rejected the deal.

Following the AAB's rejection of the proposed settlements, the matter proceeded to a contested hearing before the AAB. The hearing, beginning on January 31, 2001, and concluding on May 29, 2001, consumed 19 days of public hearings and a number in closed session. Numerous witnesses testified, and over 100 exhibits were introduced. In addition, Petitioners' attorneys spoke. Petitioners' opening brief describes their participation as they *"gave testimony and submitted extensive documentary evidence including* three seminal evidentiary pieces which the AAB admitted into evidence over the strenuous objections of the City Attorney and IBM. (C.T. p. 718, 11. 17–28) [Petitioners'] evidence, the IRS Form 5500, the State Board opinion, and a letter to the DOL [(Department of Labor)] from Equitable's counsel, demonstrated fraud and change of ownership. In the main, [Petitioners'] *admitted* evidence relied on the DOL files obtained by [Petitioners]. [¶] While [Petitioners] were not parties to the AAB proceedings, nonetheless, [Petitioners] provided critical admissible evidence that the AAB incorporated in its decision upholding the fraud penalty and ownership change. (C.T. p. 718, 11. 17–28.) [Petitioners] attended all the public hearings. [Petitioners] participated as 'public commentators' pursuant to San Francisco's Sunshine Ordinance which provides opportunity for public comment and presentation of relevant evidence. [Petitioners] persuaded Richard Hongisto to 'comment publicly' before the AAB which he did most emphatically."[8]

On August 31, 2001, the AAB issued its "Findings of Fact, Conclusions of Law, and Decision," a decision that was a complete victory for the City: The AAB determined there had been a change of ownership based on the 1986 separate account transaction, accepted the values the assessor had submitted, and upheld the fraud penalties.

Thereafter, the City and the assessor notified the AAB that the "taxpayer" was due a partial refund as a result of the AAB's decision that the property should in part be valued at a lower rate than the assessor used, and on March 8, 2002, the AAB issued a clarification of its prior order holding that the fraud penalty could be applied only to the One Market Plaza office building, and not the off-site garage.

## I. *The Consolidated San Francisco County Actions*

In February 2002, the Plan filed a complaint in the San Francisco Superior Court, which challenged both the conclusion of a change in ownership and

---

[8] While the recitation in the brief refers to Petitioners as participants in the AAB proceedings, the fact is that it was Petitioners' attorneys who participated.

the fraud penalty. However, during the trial court proceedings, the Plan narrowed the relief sought to a full refund of the fraud penalties imposed or, in the alternative, to a partial refund of the fraud penalties imposed on the garage site based on the clarification order.

In May 2002, the assessor filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) against the AAB, seeking to set aside the March 2002 clarification order on the ground that the AAB lacked jurisdiction to modify the substance of its August 2001 decision.

The two actions were consolidated and came on for hearing before Judge Alex Saldamando. On April 28, 2004, Judge Saldamando entered judgment, affirming all actions of the AAB. The Plan appealed, and in August 2005, Division Five of this court filed its opinion on that appeal. (*IBM Personal Pension Plan v. City and County of San Francisco, supra*, 131 Cal.App.4th 1291.)

### J. *The Motion for Attorneys' Fees*

Meanwhile, by order dated April 26, 2004, the within matter was assigned to Judge Richard Kramer for single assignment. At a case management conference on October 5, 2004, Petitioners advised of their intent to file a motion for attorneys' fees, and Judge Kramer ordered that the motion address first the issue of entitlement, leaving any issue of amount for future determination.

On October 14, 2004, Petitioners filed their "Motion for Award of Reasonable Attorneys' Fees—Entitlement Part 1." The motion sought attorneys' fees under three theories: (1) common fund, (2) substantial benefit, and (3) the private attorney general statute in Code of Civil Procedure section 1021.5 (section 1021.5). The moving papers were hundreds of pages in length and included a lengthy memorandum of points and authorities, and declarations from former Assessor Richard Hongisto and attorneys Doherty, Mendelson, and Lesser. Petitioners also included a request for judicial notice.

At a case management conference on November 29, 2004, Judge Kramer ordered the motion set for hearing on March 9, 2005, with opposition due February 22, 2005, and reply by March 2, 2005.

On December 17, 2004, the parties participated in an unreported telephone conference call with Judge Kramer, following which an agreed-to form of order was entered, which in pertinent part reads as follows: "1. On March 9, 2005, the Court will hold a hearing on Petitioners' Motion for Attorneys Fees, Part One (Entitlement). The legal issue to be addressed at that hearing

is whether the lack of presuit notification bars Petitioners' claim to attorneys fees under any of the legal doctrines set forth in Petitioners' motion. The March hearing will focus on whether anything that happened, or did not happen, up until the filing of the writ petition in this matter affects Petitioners' right to obtain attorneys fees."

A few days later, Petitioners filed a "Supplemental Memorandum of Points and Authorities" which in its introduction and background section confirmed that as a result of the various conferences noted above and on-the-record and off-the-record discussions "between the Court and Parties regarding 'preliminary issues' . . . . the parties agreed to frame the preliminary issue as: 'whether the lack of presuit notification bars Petitioners' claim to attorney fees under any of the legal doctrines set forth in Petitioners' Motion and whether anything happened, or did not happen, up to the filing of the writ petition in this matter affecting Petitioners' right to obtain attorneys' fees.' " This supplemental memorandum sought attorneys' fees under the common fund theory and former section 7.700 of the Charter. In support of the supplemental memorandum, Petitioners filed a declaration of Frank W. Mahoney III who had previously served as a member of the AAB and participated in the hearings on One Market Plaza.

On February 22, 2005, the City filed its opposition to the motion, which included declarations from Dunbar and Deputy City Attorney Owen Clements, both with numerous exhibits. On March 1, 2005, Petitioners filed their reply, and the matter was fully briefed for the March 9, 2005 hearing.

The motion came on as scheduled on March 9, 2005, prior to which Judge Kramer had issued a tentative ruling denying the motion. At the beginning of the hearing, Judge Kramer confirmed that before him were two questions: "whether the lack of pre-suit notification by the petitioners here to the City precludes their getting attorneys' fees, and also whether anything happened . . . after the filing of the petition, which would give them a right to attorneys' fees, notwithstanding whatever the effect of the failure of giving pre-filing notice."[9] Judge Kramer then explained the basis of his tentative ruling, as follows:

"As to the failure to give notice in advance, I think there is a good, solid, practical reason for requiring such notice. It's to keep costs down; it's to give the government an opportunity to do what the government is supposed to do. And it's to avoid, at a minimum, a duplication of effort, maybe even more than a duplication of effort. I think that is a solid rule which applies here. The petitioners did not give notice prior to the filing . . . a writ of mandamus.

---

[9] We note that the "whether anything happened" issue apparently shifted from "up to the filing" of the petition to "after the filing."

"Regarding whether or not something else happened that would nonetheless justify fees, I've said the answer to that is 'no.' First and maybe foremost, is there was never any favorable result of the writ proceeding. And I believe that that is, in the usual circumstance, perhaps subject to exceptions not applicable here, a major requirement. There has to be a success, favorable judgment on a writ petition."

Against that background, Judge Kramer heard extensive argument, lasting almost two and one-half hours, at the conclusion of which he announced his decision. Judge Kramer began by expressly stating that he was "making no findings one way or the other of a normative nature as to who should have done what . . . no findings one way or the other as to who . . . found the fund, who preserved it, or who maintained it. All I'm doing is figuring out whether there is a legal basis for fees. [¶] Similarly, I am making no finding . . . as to whether the assessor would have done something in particular or whether the assessor did run with the information."

Judge Kramer went on to discuss section 1021.5, concluding that the section "does apply to activities by citizens, taking it on their own to go and supplement, or if you want to be pejorative, supplant the activities of the government, and later hope to get attorneys' fees and costs as a result. This is solid law. It has great practical application. It eliminates a lot of difficulties later on, some of which are reflected in this case."

Then he asked, "[Do] the common fund, or the substantial benefit equitable doctrines supplement 1021.5? I think not, for important reasons" which he set forth, and then concluded, "So I'm going to make it easy for you in terms of getting review of this. I hold that 1021.5 is the exclusive manner in which you can get attorneys fees and costs from the government in a situation such as what happened here and that the common fund and substantial benefit theories do not apply to the petitioners' request here. [¶] And that being so, it seems that it's been conceded by the petitioners that they are not applying under 1021.5; therefore, the request for attorneys' fees is not justified by law."

There followed a formal order denying Petitioners' motion for attorneys' fees, prepared, interestingly enough, by Petitioners' attorneys. The order was three paragraphs long, and concluded as follows: "After full consideration of the evidence and the argument of counsel containing [*sic*] in all supporting and opposing papers heretofore filed by the parties, the papers previously filed in this action, and the arguments of counsel, and good cause appearing therefore, and for the reasons stated in open court, the Court ruled as follows: [¶] It is hereby ordered that Petitioners' Motion for an Award of Attorney Fees is denied on the grounds that the exclusive manner whereby Petitioners

can receive attorney fees and costs from the government herein is pursuant to C.C.P. § 1021.5. Further, neither the common fund nor substantial benefit theories apply herein. Petitioners do not seek fees under C.C.P. § 1021.5, therefore Petitioners' attorney fee request has no legal basis."

Petitioners filed a timely notice of appeal.

## II. SUMMARY OF PETITIONERS' POSITION

As indicated above, Petitioners' claimed entitlement to attorneys' fees has evolved, beginning with their three petitions which sought fees under former section 7.700 of the Charter "and/or relevant case law," which "fees should be based upon and taken from the common fund created. . . ." Then, in their original moving papers, Petitioners sought fees under the common fund, substantial benefit, and private attorney general doctrines, and in their supplemental memorandum under the common fund theory and former section 7.700 of the Charter. Finally, at the hearing below Petitioners acknowledged that they were no longer proceeding under the private attorney general theory, but only on the common fund and substantial benefit theories. And that is their position here.

Petitioners make three fundamental contentions on appeal, set forth in their opening brief as follows: (1) Petitioners are entitled to attorneys' fees under the common fund theory, under "well established precedent"; (2) Petitioners are entitled to attorneys' fees on the substantial benefit theory, a "review of [which theory] demonstrates, as a matter of law, the lower Court's ruling is wrong"; and (3) the trial court's denial of attorneys' fees "has no legal or factual basis." The claimed bases for these, as the introduction to Petitioners' opening brief distills it, are: (1) their "discovery, investigation, and litigation" of the change in ownership; (2) their representation of the City as amicus curiae in the federal case; and (3) their "taxpayer class representation" before the AAB, where, they claim, because of their advocacy the AAB (a) rejected the settlements and (b) adopted their legal positions.

## III. DISCUSSION

### A. *The Standard of Review*

"The decision as to whether an award of attorney fees is warranted rests initially with the trial court. . . . [¶] Where, as here, a trial court has discretionary power to decide an issue, its decision will be reversed only if there has been a prejudicial abuse of discretion." (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142–143 [185 Cal.Rptr. 232, 649 P.2d 874], fn. omitted [§ 1021.5 case]; accord, *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74

Cal.App.4th 961, 964 [88 Cal.Rptr.2d 565] [§ 1021.5 case]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511] [Civ. Code, § 1717 case].)

On the other hand, we exercise our independent review on an appeal raising a pure issue of law regarding the entitlement to attorneys' fees. (*Snyder v. Marcus & Millichap* (1996) 46 Cal.App.4th 1099, 1102 [54 Cal.Rptr.2d 268].) Put another way, "The determination of the statutory basis for an attorney fees award presents a legal issue for us to determine anew on appeal, regardless of the trial court ruling." (*Akins v. Enterprise Rent-a-Car Co.* (2000) 79 Cal.App.4th 1127, 1132–1133 [94 Cal.Rptr.2d 448].)

Whether Judge Kramer's "holding" that section 1021.5 is the "exclusive manner" available to Petitioners is right is not the issue here, but whether his decision denying fees was the correct result. "There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion." (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 [253 Cal.Rptr. 693, 764 P.2d 1070].) Or, as Witkin puts it, "If the *decision* of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, p. 382.)

We conclude that the order denying Petitioners' motion was correct, as Petitioners are not entitled to attorneys' fees under any theory.

### B. *The Law of Attorneys' Fees*

"California follows what is commonly referred to as the American rule, which provides that each party to a lawsuit must ordinarily pay [his, her, or its] own attorney fees. [Citations.] The Legislature codified the American rule in 1872 when it enacted Code of Civil Procedure section 1021, which states in pertinent part that 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties. . . .' " (*Trope v. Katz* (1995) 11 Cal.4th 274, 278–279 [45 Cal.Rptr.2d 241, 902 P.2d 259] (*Trope*).)

Various theories have developed as exceptions to this rule, some of which are created by statute and others by common law. As noted above, Petitioners originally argued three such theories below as the claimed bases for their

entitlement to fees: (1) common fund, (2) substantial benefit, and (3) the private attorney general, and we begin with exposition of each theory.[10]

### (1) The Common Fund Theory

█ The common fund theory was described in *Serrano v. Priest* (1977) 20 Cal.3d 25, 35 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*): " '[O]ne who expends attorneys' fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair share of the litigation costs.' [Citation.] This, the so-called 'common fund' exception to the American rule regarding the award of attorneys fees . . . is grounded in 'the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund of property itself or directly from the other parties enjoying the benefit.' [Citation]."

### (2) The Substantial Benefit Theory

The substantial benefit theory, also described in *Serrano III, supra,* 20 Cal.3d 25, was the subject of further description in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 943 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*): "In *Serrano III*, we explained that the substantial benefit theory 'which may be viewed as an outgrowth of the "common fund" doctrine, permits the award of fees when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a "substantial benefit" of a pecuniary or nonpecuniary nature. In such circumstances, the court, in the exercise of its equitable discretion, thereupon may decree that under dictates of justice those receiving the benefit should contribute to the costs of its production.' [Citation.] Unlike the private attorney general concept, which, as we have seen, is intended to promote the vindication of important rights affecting the public interest, the 'substantial benefit' doctrine—like the 'common fund' doctrine from which it emerged—rests on the principle that those who have been 'unjustly enriched' at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained."

The common fund and substantial benefit theories are equitable theories (see generally Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2005), ch. 7, p. 222 (Pearl)), and equitable principles are appropriately applied in determining whether to award attorneys' fees sought under these theories.

---

[10] While, as noted, Petitioners abandoned their claim under section 1021.5, we nevertheless discuss this basis for fees, especially as many of the cases, including some relied on by Petitioners, involve this statute.

### (3) *The Private Attorney General Statute*

█ The private attorney general doctrine, originally also a creature of the court's "inherent equitable authority" (see *Trope, supra,* 11 Cal.4th at p. 279), is found in section 1021.5.[11] The statute provides in essence that a "successful" party may be awarded attorneys' fees against "one or more opposing parties" in an action that results in the enforcement of an important right affecting the public interest. The private attorney general doctrine is based on the theory that "privately initiated lawsuits are often essential to the effectuation of the fundamental public polices embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills, supra,* 23 Cal.3d at p. 933.)

Three basic criteria are required to support an award of attorneys' fees under section 1021.5: (1) the action resulted in the enforcement of an important right affecting the public interest; (2) a significant benefit was conferred on the general public or a large class of persons; and (3) the necessity and financial burden of private enforcement were such as to make the award appropriate. (*Woodland Hills, supra,* 23 Cal.3d at pp. 933–934; *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 317–318 [193 Cal.Rptr. 900, 667 P.2d 704].)

### C. *Petitioners Did Not Prevail, Nor Meet the Requirements of the Catalyst Theory*

The general rule is that a party seeking attorneys' fees must "prevail" or be "successful" (Pearl, *supra,* § 2.1, pp. 20–21), which rule pertains regardless of the theory on which one seeks fees. Thus, *Serrano III* explained that the common fund may benefit one " 'who expends attorneys' fees in *winning a*

---

[11] Section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefor under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code.

"Attorneys' fees awarded to a public entity pursuant to this section shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in *Serrano v. Priest,* [*supra,*] 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]."

*suit . . . .' "* (*Serrano III, supra,* 20 Cal.3d at p. 35, italics added.) Similarly, the substantial benefit doctrine may support a fee award to a litigant " 'proceeding in a representative capacity, [who] *obtains a decision* resulting in the conferral of a "substantial benefit" ' " (*Woodland Hills, supra,* 23 Cal.3d at p. 943, italics added.) Illustrative is *Johnson v. Tago, Inc.* (1986) 188 Cal.App.3d 507, 518 [233 Cal.Rptr. 503] (*Johnson*), where, in reversing an award of attorneys' fees as premature, Division Four of this court noted that the "substantial benefit exception is limited to 'successful' plaintiffs, i.e., plaintiffs who have ultimately prevailed in the litigation." This is the requirement under the equitable theories and, as quoted above, the rule is the same under section 1021.5, which expressly states that fees may be awarded only to one who is "successful."

As also quoted above, Judge Kramer supported his tentative ruling in part on the basis that there was no favorable result in the writ proceeding. Later, in referring to *Knoff v. City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683] (*Knoff*), the primary case on which Petitioners rely, he distinguished that case in part as involving a "successful petition." And respondents argued below, as they do here, that to receive fees Petitioners must establish that they "succeeded on the merits." Despite all this, Petitioners' opening brief eschews any reference to, much less discussion of, any requirement of "prevailing" or "success." And their reply brief responds only with the conclusory assertion that respondents' argument that Petitioners "failed to obtain favorable judgment . . . has no legal basis," in claimed support of which Petitioners cite only *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668 [186 Cal.Rptr. 589, 652 P.2d 437]. *Folsom* involved an action which ended in a settlement between the parties that was silent as to the issues of costs and attorneys' fees, and the Supreme Court affirmed that plaintiffs were successful parties and entitled to fees under section 1021.5. There is no settlement here. The petition was dismissed. In short, Petitioners do not meaningfully address the requirement that they must prevail.

But a requirement it is, and even the cases with the most liberal interpretation of "prevail" or "succeed" do not avail Petitioners. To the contrary, the most liberal approach of the most recent decision on the subject imposes a requirement that is devastating to Petitioners' claim—and provides complete support for Judge Kramer's determination. That case is *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*).

In *Graham*, DaimlerChrysler marketed its 1998 and 1999 Dakota R/T trucks as having a 6,400-pound towing capacity when in fact they could tow only 2,000 pounds. (*Graham, supra,* 34 Cal.4th at p. 561.) DaimlerChrysler

became aware of the error in early 1999, set up a response team, notified its customers of the error, and initially offered cash and merchandise in compensation; it later authorized dealers to offer, on a case-by-case basis, to repurchase or replace the trucks if the buyer so demanded. (*Id.* at p. 562.) In late July and early August, the Santa Cruz County District Attorney and the California Attorney General threatened legal action for false advertising, and requested a response from DaimlerChrysler by the end of August 1999. Meanwhile, on August 23, 1999, the plaintiffs filed their complaint seeking return of their payments, compensatory damages, and attorneys' fees, premised on a single cause of action for breach of express warranty. (*Ibid.*) Less than three weeks later, DaimlerChrysler issued an offer to all Dakota R/T buyers to repurchase or replace their trucks. (*Id.* at p. 563.)

When the plaintiffs' amended complaint acknowledged those offers, DaimlerChrysler filed a demurrer, which the trial court sustained without leave to amend and dismissed the case as moot. (*Graham, supra,* 34 Cal.4th at p. 563.) DaimlerChrysler then settled with the public agencies by paying a $75,000 fine and agreeing to ensure the marketing error did not reoccur. (*Ibid.*)

Notwithstanding the dismissal, the plaintiffs sought attorneys' fees under section 1021.5. The trial court awarded such fees, finding that the requirements of section 1021.5 had been met, rejecting DaimlerChrysler's assertion that the plaintiffs' suit had no bearing on its decision, and finding that the public agencies' inquiries did not make the suit unnecessary as the agencies never sought any remedies on behalf of the buyers. (*Graham, supra,* 34 Cal.4th at pp. 563–564.) The Court of Appeal affirmed. (*Id.* at p. 564.) As did the California Supreme Court.

■ *Graham* recognized that California courts have taken a broad view of what constitutes "success," holding that it is not limited to a party who has obtained a judicially ordered or judicially recognized resolution of the dispute, such as a final judgment or court-approved settlement. Declining to follow the United States Supreme Court's holding in *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources* (2001) 532 U.S. 598, 600 [149 L.Ed.2d 855, 121 S.Ct. 1835] (*Buckhannon*), the California Supreme Court affirmed that a party also may be found to be successful, and thus entitled to fees, if the lawsuit " ' "was a *catalyst* motivating defendants to provide the primary relief sought." ' " (*Graham, supra,* 34 Cal.4th at p. 589, quoting *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 353 [188 Cal.Rptr. 873, 657 P.2d 365] (*Westside Community.*)

While holding that the catalyst theory was the law in California, the court adopted a limitation proposed by the Attorney General appearing as amicus

curiae, a limitation dispositive here. This limitation is that "a plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation. (See *Grimsley v. Board of Supervisors* (1985) 169 Cal.App.3d 960, 966–967 [213 Cal.Rptr. 108] [(*Grimsley*)].)" (*Graham, supra,* 34 Cal.4th at p. 577.) This requirement, the Supreme Court elaborated, "is fully consistent with the basic objectives behind section 1021.5 and with one of its explicit requirements—the 'necessity . . . of private enforcement' of the public interest. Awarding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation does not advance that objective and encourages lawsuits that are more opportunistic than authentically for the public good. Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." (*Ibid.*)

The catalyst theory was also recognized in the companion case to *Graham,* a case even more particularly applicable here, as it involved a public entity defendant: *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604 [21 Cal.Rptr.3d 371, 101 P.3d 174] (*Tipton*). *Tipton* was a class action in federal district court seeking damages and injunctive relief against the city for sexual and racial discrimination. Settlement negotiations led to a consent decree, which was revoked by the district court. The plaintiffs then began negotiations with a newly appointed police chief, which were not fruitful. But while no settlement was reached, the police department voluntarily implemented several antidiscrimination policies. (*Id.* at p. 607.)

The plaintiffs moved for attorneys' fees on the catalyst theory, arguing that the voluntary changes were similar to the original consent decree. The district court ruled for the plaintiffs and the city paid the award without appeal. A year later, following the decision in *Buckhannon, supra,* 532 U.S. 598, the city moved for reconsideration, which the district court granted, and then went on to uphold the award under California law. (*Tipton, supra,* 34 Cal.4th at p. 608.) The city appealed, and the Ninth Circuit certified the question of the viability of the catalyst theory to the California Supreme Court, which upheld the theory for the reasons stated in *Graham, supra,* 32 Cal.4th 553, summarizing its holding there as follows: "In order to obtain attorney fees without . . . a judicially recognized change in the legal relationship between the parties, a plaintiff must establish that (1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense, as elaborated in *Graham*; and (3) that the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." (*Tipton,* at p. 608.)

 And, given that the defendant was a public entity, the Supreme Court "emphasize[d] another critical limitation first articulated . . . over 20 years ago," affirming the holding in *Westside Community*, *supra*, 33 Cal.3d 348. (*Tipton*, *supra*, 34 Cal.4th at p. 608.) "Attorney fees may not be obtained, generally speaking, by merely causing the acceleration of the issuance of government regulations or remedial measures, when the process of issuing those regulations or undertaking those measures was ongoing at the time the litigation was filed. When a government agency is given discretion as to the timing of performing some action, the fact that a lawsuit may accelerate that performance does not by itself establish eligibility for attorney fees." (*Id.* at p. 609.) Then the Supreme Court responded to the city's argument that the catalyst theory would deter public agencies from making voluntary changes after litigation has been filed. Not so, the court said, because "[a]s noted above, we have adopted the requirement that a plaintiff attempt to settle its grievance short of litigation. Thus, for example, when the responsible authorities of a public agency are unaware of a discriminatory policy by their subordinates, prompt correction of this policy once it is brought to their attention will avoid payment of attorney fees." (*Ibid.*)

*Grimsley*, *supra*, 169 Cal.App.3d 960, 961, cited with approval in *Graham*, *supra*, 34 Cal.4th at p. 577, is also persuasive. Grimsley, "a concerned citizen," filed two motions for attorneys' fees, following a judgment commanding the county to adopt a plan as ordered by the court. Grimsley's action was filed during the county's further study and modification of the plan, and his fee motions followed an order which arose out of an action to which Grimsley had not been a party. Both motions for fees were denied; Grimsley appealed them both; and the Court of Appeal affirmed them both.

The court first observed that an award of attorneys' fees under section 1021.5 is discretionary, and will not be reversed absent a showing of abuse of discretion; it then "observe[d] 'that courts may be guided by equitable principles when awarding attorney's fees.' " (*Grimsley*, *supra*, 169 Cal.App.3d at p. 965.) Most significantly, the court observed that Grimsley, "although he had ample opportunity to do so before commencement of his action, made no complaint or suggestion to the concerned county officials about the failure to comply with [the law], or in what respects those statutes were not followed. [¶] We are of the opinion, in a case such as this, that before commencing his action a 'private attorney general,' such as plaintiff Grimsley, must be required reasonably to point out to the responsible county official or administrative or legislative body, such a claimed shortcoming of a general plan, thus to avoid litigation and substantial public expense. [¶] . . . [¶] Here, it is a near certainty that had Grimsley timely pointed out to an appropriate county official or agency, the respects in which [the law] had not been followed, appropriate corrective action would have been promptly forthcoming. [¶] Applying the rationale of *Phelan v. Superior Court* [(1950)] 35 Cal.2d 363

[217 P.2d 951], we hold that attorney fees under Code of Civil Procedure section 1021.5, will not be awarded unless the plaintiff seeking such fees had reasonably endeavored to enforce the 'important right affecting the public interest,' *without litigation and its attendant expense.*" (*Grimsley, supra,* 169 Cal.App.3d at p. 966.)

■ It had been recognized long before *Graham* that a party may be deemed successful even if, as here, the case has been dismissed. (E.g., *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1291 [240 Cal.Rptr. 872, 743 P.2d 932] [section 1021.5 case; "[i]n determining whether a plaintiff is a successful party . . . '[t]he critical fact is the impact of the action, not the manner of its resolution' "].) Likewise may a plaintiff be deemed successful even though the case has become moot. (E.g., *Coalition for Economic Survival v. Deukmejian* (1985) 171 Cal.App.3d 954, 963 [217 Cal.Rptr. 621].) While these holdings are facially favorable to Petitioners, the principle behind them is not. For, as Pearl points out, the "principle that a party whose claim is mooted may nevertheless be a prevailing party stems from the catalyst theory of entitlement to reasonable attorney fees." (Pearl, *supra,* § 2.21A, p. 54.) And the prelitigation notice requirement of the catalyst theory—admittedly not provided by Petitioners—is dispositive.

Petitioners' opening brief does not even mention *Graham.* And their reply brief argues only that there is no law holding that presuit notification is a prerequisite to recovery under the common fund or substantial benefit theories. They cite nothing in support of that assertion, but do cite *TRIM, Inc. v. County of Monterey* (1978) 86 Cal.App.3d 539 [150 Cal.Rptr. 351], as holding that they are "not required to exhaust administrative remedies before filing mandate where taxpayers seek to mandate a public official to perform a ministerial duty against a third party." Administrative remedies are not the issue here. Presuit notification is.

While Petitioners' argument is not crystal clear, they may be contending that the catalyst theory does not apply to fees sought under the common fund or substantial benefit theories. If this is their argument, they must lose, as they did not prevail. In other words, they need the catalyst theory, as they perhaps concede, manifest by references in the brief to their being the "moving force." If, on the other hand, Petitioners' argument is that the prenotification requirement of the catalyst theory does not apply except in a claim for fees under section 1021.5, they offer nothing in support. And we can discern no rational basis for such a distinction.

To the contrary, *Graham* itself found support for its conclusion of "prevailing party" by reference to its construction of that term in claims for fees under Civil Code section 1717, that is, a contractual provision for fees to one

party. (*Graham, supra,* 34 Cal.4th at p. 571.) This has nothing to do with section 1021.5. Even more telling is *Tipton*, which specifically held that the catalyst theory applied to Government Code section 12965 cases, that is, attorneys' fees under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). (*Tipton, supra,* 34 Cal.4th at p. 610.) Finally, we note that cases have recognized the catalyst theory in common fund cases. (See, e.g., *Savoie v. Merchants Bank* (2d Cir. 1996) 84 F.3d 52, 56–57; and *Koppel v. Wien* (2d Cir. 1984) 743 F.2d 129, 135; and see generally *Consolidated Edison Co. of New York v. Bodman* (D.C. Cir. 2006) 445 F.3d 438, 457 [recognizing that "some version of the catalyst theory applies, illustrated by decisions awarding common fund fees even where the claimants' action was dismissed as moot"].)

■ In sum, Petitioners must necessarily attempt to avail themselves of the benefit of the catalyst theory. With the benefit of that theory comes its burden, the requirement of presuit notification, a requirement, we conclude, that applies regardless of the theory under which one seeks fees. Petitioners admittedly did not meet that burden. Their claim must fail.

In support of their contentions on appeal, Petitioners fundamentally rely on three cases, one of which did involve an award of attorneys' fees resulting from reassessment of real property owned by others: *Knoff, supra,* 1 Cal.App.3d 184. *Knoff*, a mandamus action, had its origin in the 1965 indictment of the San Francisco Assessor, who was charged with accepting bribes in exchange for favorable property tax assessments. The petitioners, four San Francisco taxpayers, made a demand that the assessor's office do its duty and reassess the properties. Those demands were rejected, and the petitioners filed a writ against the City and County of San Francisco, its board of supervisors, and the under-indictment assessor. (*Id.* at pp. 190, 192.) The trial court granted judgment on the pleadings for the petitioners, concluding that, "despite proper demands made upon them" to reassess the property, none of the defendants had acted, claiming that they did not do so as they "desired to await the conclusion" of the criminal prosecution "so as not to prejudge" the assessor's guilt. The trial court ordered a peremptory writ of mandate, including against the board and the assessor. (*Id.* at pp. 193–194.)[12]

---

[12] The board was ordered to (a) initiate a full investigation into the loss of property taxes during pertinent assessment years, and (b) conduct the project in cooperation with the assessor and his office but "through" independent experts, who were to identify taxable property which had not been assessed, or which had been underassessed or had otherwise escaped taxation for any reason. The assessor was ordered to take appropriate action to identify the property in question, to make new assessments as authorized by law, to make appropriate changes in the assessment roll, and to recover property taxes owing the city and county, with appropriate penalties authorized by law. (*Knoff, supra,* 1 Cal.App.3d 184.)

After finding that the petitioners had standing, the trial court awarded them fees pursuant to former section 27 of the Charter, which provided as follows: " 'In the event that a taxpayer of the city and county institute suit or other proceeding as provided by law against any officer, board or commission of the city and county in the name of said taxpayer on behalf of the city and county, if judgment be finally entered in his favor he shall be allowed his costs and also such reasonable compensation for attorney's fees as may be fixed by the court.' " (*Knoff, supra,* 1 Cal.App.3d at p. 203, fn. 14.) The Court of Appeal affirmed, including the award of attorneys' fees.

*Knoff* is manifestly distinguishable from the setting here. The petitioners in *Knoff* made a presuit "demand." (*Knoff, supra,* 1 Cal.App.3d at p. 193.) Petitioners here stipulated that they did not—without which, of course, there could be no refusal to act. The petitioners in *Knoff* were determined to have standing (*id.* at p. 198), which is not demonstrated here. (See fn. 3, *ante.*) Finally, the petitioners in *Knoff* recovered fees under former section 27 of the Charter, based on "a judgment in their favor." (*Id.* at p. 202.) There is no such judgment here.[13]

Petitioners also cite to *Bank of America v. Cory* (1985) 164 Cal.App.3d 66 [210 Cal.Rptr. 351] (*Cory*), which, they assert, applies the common fund criteria in an "analogous situation." We disagree. *Cory* was an action by taxpayers against the state controller seeking to compel him to perform his duty to enforce the unclaimed property law (Code Civ. Proc., § 1500 et seq.) against a bank which had imposed interest charges on dormant accounts and discontinued paying interest on them. (164 Cal.App.3d at p. 66.) At one point the taxpayers obtained a preliminary injunction invalidating certain emergency regulations the controller had issued. (*Id.* at p. 82.)

The taxpayers' action was then consolidated with an action against the bank in which the controller sought to recover the dormant funds plus interest and damages under Government Code section 12419. The trial court found, inter alia, that the controller did not start to effectively enforce the unclaimed property law until challenged by the taxpayers' suit, and therefore awarded the taxpayers attorneys' fees under section 1021.5. (*Cory, supra,* 164 Cal.App.3d at p. 84.) The Court of Appeal affirmed the award of attorneys' fees on the basis that the totality of the evidence supported the conclusion that the taxpayers' suit was the sine qua non of the controller's actions. As the court noted, the controller "grudgingly concede[d] the taxpayers' approach resulted in a larger recovery. Most important, however, is the fact the Controller did not enforce the [unclaimed property law] until provoked into

---

[13] Petitioners assert that in *Knoff* "this Appeal Court applied the 'common fund' rationale to uphold the award of attorneys' fees." One searches *Knoff, supra,* 1 Cal.App.3d 184, in vain for any mention of "common fund."

action by the taxpayers' suit." (*Cory, supra,* 164 Cal.App.3d at p. 84.) The setting here is not analogous.

Petitioners also cite *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410 [14 Cal.Rptr.2d 885], in which a taxpayers group filed suit challenging the validity of a sales tax that had been approved by a bare majority of the electorate. The trial court entered judgment declaring the tax invalid as not approved by a two-thirds vote, and ordered disbursement of the invalidly collected taxes. It also awarded attorneys' fees under the private attorney general statute. The Court of Appeal agreed that attorneys' fees were appropriate, but not under the private attorney general statute. Rather, the attorneys should be paid "their reasonable attorney fees pursuant to the well-established equitable doctrine of 'the common fund theory.' . . . [¶] The Taxpayers' 'recovery' of the invalidly collected supplemental sales tax revenues in this case, and the resultant preservation of those revenues to satisfy subsequent refund claims . . . constitutes a precise 'fit' within the 'common fund theory.' " (*Rider v. County of San Diego, supra,* 11 Cal.App.4th at pp. 1422–1423.) The setting here is not such a fit.

Finally, we note the observation in *City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 114 [48 Cal.Rptr.2d 42, 906 P.2d 1196], a case which Petitioners cite, where the California Supreme Court held that one of the three common elements required to support a common fund fee award is that "the attorney fees [are] sought by the sole 'active litigant' whose recovery created the fund." Petitioners were not that litigant.

In sum, Petitioners' admitted noncompliance with the prefiling requirement of *Graham, supra,* 34 Cal.4th 553, by itself defeats their claimed entitlement to attorneys' fees. So, too, the general law applicable to the common fund and substantial benefit theories.

> (1) *Equitable Considerations Demonstrate That Petitioners Are Not Entitled to Attorneys' Fees*

As quoted above, Judge Kramer's order denying Petitioners' motion held that "Further, neither the common fund nor substantial benefit theory apply herein." While Judge Kramer did not elaborate on the basis of that conclusion, and it may be that he was relying on section 1021.5 being the "exclusive manner" by which Petitioners could proceed, our review of the record here—a record that Petitioners assert is complete[14]—demonstrates that

---

[14] Petitioners argue that the record is complete, providing the basis on which we should award them a specific amount of fees, despite that the issue of amount was not before the court below. Petitioners are correct that the record is as complete as it can be from their side, as their version of "facts" rests essentially uncontroverted in the record. (See fn. 1, *ante.*) Thus, and

attorneys' fees are not appropriate under either the common fund or substantial benefit theories based on equitable considerations.

As noted above, the common fund and substantial benefit theories are equitable theories, with equitable principles appropriately applied in determining whether to award attorneys' fees sought under them. (*Neal v. County of Stanislaus* (1983) 141 Cal.App.3d 534, 538–539 [190 Cal.Rptr. 324].) Both doctrines "exist in equity so that the active litigator who extends a benefit to a class of passive beneficiaries is not made to bear the cost of litigation on his or her own." (*Baker v. Pratt* (1986) 176 Cal.App.3d 370, 380 [222 Cal.Rptr. 253].)

There is no question that Petitioners' attorneys expended much effort injecting themselves into the saga of One Market Plaza. Likewise without question is that the City resisted such involvement, repeatedly stating that such involvement was unnecessary—indeed, unwelcome. Back and forth the missives flew, in the setting described by Doherty as "hostile and uncooperative." What, then, are the equitable considerations that favor or disfavor Petitioners?

To begin with, there is the 15 or so months from the time Lesser first got wind of the One Market Plaza issue to the disclosure of any fact, during which time he withheld all information as he attempted to have the City pass the legislation Petitioners sought, the effect of which, to use the word Petitioners agreed in the stipulation, would be to obtain a "reward." When that did not succeed, the petition was filed, but without any prior demand that the City do what Petitioners claimed it must do, or even giving the City the benefit of the information Petitioners' attorneys had, a petition thus filed in disregard of *Grimsley, supra,* 169 Cal.App.3d 960, where seven years earlier the court had said that such notification is required. Given what in fact happened here, paraphrase of the observation in *Grimsley* is apt: "it is a near certainty that had [Petitioners' attorneys] timely pointed out to an appropriate county office or agency, the respects in which [the law] had not been followed, appropriate corrective action would have been promptly forthcoming." (*Id.* at p. 966.) Also apt is *Grimsley*'s holding, "that attorney fees under Code of Civil Procedure section 1021.5, will not be awarded unless the plaintiff seeking such fees had reasonably endeavored to enforce the 'important right affecting the public interest,' *without litigation and its attendant expense*." (*Ibid.*)

■ That was the law when Petitioners began their quest, at least in section 1021.5 settings, and a long-established maxim of equity jurisprudence is that

because Petitioners assumedly marshaled the best case they could, it is proper for us to determine that Petitioners are not entitled to fees. (See *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918], and authorities there cited.)

described in *Johnson*: "A trial court's equity powers are formidable [citation], but must be exercised pursuant to the principle that equity follows the law. [Citations.] A court of equity cannot grant relief which the law denies . . . [T]he law . . . has not yet yielded its primacy to equity." (*Johnson, supra,* 188 Cal.App.3d at p. 518.)

Next, there is the subject of settlement which, as noted above, the City twice attempted, which attempts Petitioners resisted, according to them with marked success, thwarting both attempts. Referring to the City's attempted settlement, Petitioners describe it as a "particularly sordid act in this ten-year-old drama." And, Petitioners assert, were it not for them, the City would have "given back" $24 million to the Plan.

■ Whether this would have been the outcome is not apparent from the record, and certainly there is no finding of any kind in this regard. But there has long been a strong public policy favoring settlements (*McClure v. McClure* (1893) 100 Cal. 339, 343 [34 P. 822]; *Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 607 [106 Cal.Rptr.2d 1] (Lambden, J.)), and the City, acting through the city attorney, had apparently concluded that settlement was warranted in light of significant expenses associated with continued litigation, the risk that a court might determine that no change of ownership had occurred, and the potential difficulties in proving fraud to support the penalty. So, we ask, what equities favor Petitioners, who thwarted such settlement? But that is only the half of it.

If the City's attempt at settlement was "sordid," what would be the word to describe Petitioners' settlement offers? Petitioners' attorneys, whose standing to "settle" is by no means clear, themselves first proposed a settlement shortly after the 1993 announcement of the reassessment of the property, specifically in a March 24, 1993 letter to the attorney for the Plan, the attorney for Equitable, and Deputy City Attorney Kolm. There, Petitioners proposed "the following settlement": (1) Equitable and the Plan would not contest the recently assessed back taxes or the interest; (2) the City would refrain from imposing a 25 percent fraud penalty and would have no attorneys' fees obligation; and (3) in lieu of paying a 25 percent fraud penalty, Equitable and the Plan would pay attorneys' fees to Petitioners equal to 20 percent of the back property taxes and interest thereon. In short, Petitioners' settlement would result in the City receiving less and Petitioners receiving attorneys' fees of some $10 million. This, within six months of the filing of their petition—litigation of which had been stayed!

Petitioners made a similar offer on April 11, 2000, shortly before the commencement of the AAB proceedings. Under this proposal, the City would roll back the values that had been placed on One Market Plaza from the 1994

levels to the April 1993 levels, resulting in the value being reduced from the stipulated value of $400 million to $290 million for the tax year 1987–1988, with similar reductions in other years. The apparent result of this would be that the City would have received much less than it would have received under its proposed settlement with the Plan, the settlement Petitioners would later go on to oppose. But this was apparently acceptable to Petitioners, so long as the Plan paid fees to Petitioners equal to 33 1/3 percent of the taxes retained by the City. If all this is evidence of equitable conduct, it comes in a novel guise.

Despite that the motion was limited to the issue of entitlement to attorneys' fees, Petitioners devote almost a quarter of their opening brief to a request that we in fact award them a fee here. Their specific request is for some $16 million, computed as 25 percent of the $64 million-plus common fund. Alternatively, in a six-line footnote, Petitioners request $9,767,024.30. While we do not reach this issue in light of our rejection of Petitioners' claim, and would not reach it in light of the order below reserving the issue, we point it out to demonstrate the final inequity of Petitioners' position.

■■■ The amount of attorneys' fees to be awarded under any theory is to be "reasonable." And it is to be for legal work, generally not for administrative work. (See, e.g., *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 971–972 [259 Cal.Rptr. 599] [section 1021.5 case; fees allowed for successful lawsuit; fees not allowed for time spent in collateral proceedings before the Water Quality Control Board]; *Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 574–575 [30 Cal.Rptr.2d 581] [participation in Coastal Commission held to be activity "Not Entitling an Award of Attorneys' Fees"]; but see *Wallace v. Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836, 847–848 [216 Cal.Rptr. 649] [fees allowed for administrative hearings " 'intertwined inextricably' " with the legal action].) The sum total of the *legal* work on behalf of Petitioners in this proceeding was to file three petitions; oppose the motions to dismiss and one demurrer; file several miscellaneous motions, including to amend, to stay, and to consolidate; and prepare some status conference statements. And, of course, the voluminous paperwork in connection with the fee motion. Petitioners may perhaps have participated as amici curiae in the federal case. (See fn. 7, *ante*.) That is it, and for it Petitioners seek $16 million from the public coffers of the City. That is hardly reasonable. Nor equitable. But it is "a special circumstance permitting a . . . court to . . . deny [an award] altogether." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 [186 Cal.Rptr. 754, 652 P.2d 985], and numerous cases there collected.)

We close with the observation of one Court of Appeal, discussing possible applicability of the catalyst theory: "there must still be a sound basis that the

party was more than an initial impetus behind the creation of the benefit. Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund . . . ." (*In re Prudential Ins. Co. America Sales Litigation* (3d Cir. 1998) 148 F.3d 283, 337.)

## IV. CONCLUSION

Public interest litigation does much good for the public, to be sure. And certainly there are times it is necessary, as when an agency is unwilling or incapable, as excellently described in *Nestande v. Watson* (2003) 111 Cal.App.4th 232, 240 [4 Cal.Rptr.3d 18], a section 1021.5 case: " 'The private attorney general theory is based in part on the supposition that even in cases in which public enforcement is possible, public agencies are often unwilling or incapable because of insufficient staffing to protect important rights.' (McDermott & Rothschild, *Foreword: The Private Attorney General Rule and Public Interest Litigation in California* (1978) 66 Cal.L.Rev. 138, 150; accord, *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 545 [63 Cal.Rptr.2d 118] ['Due to the burdens imposed on public agencies, adequate government enforcement of the laws is not always possible, making private action imperative'].)"

At the same time, it has been noted in various ways, in varying language, that not all cases couched as pro bono publico are so motivated. For example, *Graham* itself observed that awarding fees without requiring prelitigation efforts at settlement would not advance the basic objective of the private attorney general doctrine and would encourage ". . . lawsuits that are more opportunistic than authentically for the public good." (*Graham, supra,* 34 Cal.4th at p. 577.) And while Judge Kramer specifically refrained from making any determination about "the normative nature as to who should have done what," as do we, it may be that Petitioners' case—perhaps more accurately, Petitioners' counsel's case—was one such situation.[15]

Almost 30 years ago, the California Supreme Court ended its opinion affirming the denial of attorneys' fees in a Civil Code section 1717 case with the observation that "[t]he purpose of litigation is to resolve participants' disputes, not compensate participating attorneys. Our courts are sufficiently burdened without combat kept alive solely for attorney fees." (*International Industries, Inc. v. Olen* (1978) 21 Cal.3d 218, 224 [145 Cal.Rptr. 691, 577 P.2d 1031].) As to that, we say "Amen."

---

[15] Arguing below, Lesser repeatedly urged Judge Kramer that "we" did this, and "we" did that, and "[w]e, in fact got a favorable result." At one point catching himself, he acknowledged, "We were the ones—and I'm sorry, I keep using the word 'we'—petitioners were the ones who made the judge state on the record that the assessor has done all that she was or he was required to do."

Whatever their motivation here, Petitioners must demonstrate their entitlement to attorneys' fees. This, they have not done, and the order denying attorneys' fees is affirmed.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied August 8, 2006, and appellants' petition for review by the Supreme Court was denied September 27, 2006, S146040.