[No. A127476. First Dist., Div. Five. Mar. 29, 2011.]

SARAH MORRISON, Plaintiff and Appellant, v.
VINEYARD CREEK L.P. et al., Defendants and Respondents.

COUNSEL

Western Center on Law and Poverty, Richard A. Rothschild, S. Lynn Martinez; Palandati-Goldstone and Nancy A. Palandati for Plaintiff and Appellant.

Perry, Johnson, Anderson, Miller & Moskowitz, Michael G. Miller and Deborah S. Bull for Defendant and Respondent.

OPINION

**NEEDHAM, J.**—Sarah Morrison appeals from a postjudgment order denying her motion for attorney fees under Civil Code section 1942.5 and Government Code section 12989.2 after the parties had resolved their dispute by settlement. We will affirm the order.

## I. *Facts and Procedural History*

On January 8, 2007, Morrison signed a lease and moved into an apartment at Vineyard Creek Apartments in Santa Rosa, California. The lease agreement provided on the first page, which Morrison initialed, that the apartment would "be used as a private residence and for no other purpose." Morrison did not disclose her intention to operate a family childcare home in the apartment.

On January 22, 2007, Morrison delivered a "Notice" to respondent Vineyard Creek L.P., pursuant to Health and Safety Code section 1597.40, subdivision (d)(1) of the California Child Day Care Facilities Act (Child Day Care Act). (Health & Saf. Code, § 1596.70 et seq.) In the Notice, Morrison declared her intent to operate a family child daycare facility in her apartment beginning March 1, 2007.

Toward the end of January 2007, after passing the required home inspection, Morrison received her state license to operate a family childcare home. She arranged to provide childcare for three families in her apartment.

The Child Day Care Act (including chs. 3.4, 3.5 and 3.6 of div. 2 of the Health & Saf. Code) was enacted "to provide a comprehensive, quality system for licensing child day care facilities to ensure a quality day care environment" because child daycare facilities contribute positively to children and because good quality child daycare services are an essential service for working parents. (Health & Saf. Code, § 1596.72, subd. (b); see *id.*, § 1596.73.) While the Child Day Care Act is primarily focused on licensing and quality of care, Health and Safety Code section 1597.40, subdivision (a) precludes property owners from prohibiting or restricting the use of "single-family residences" as "child daycare homes."[1]

---

[1] Health and Safety Code section 1597.40 records a legislative finding that the public policy of this state is to provide children in a family daycare home the same home environment as provided in a traditional home setting. (Health & Saf. Code, § 1597.40, subd. (a).) It further states that this policy is "of statewide concern with the purpose of occupying the field to the exclusion of municipal zoning, building and fire codes and regulations governing the use or occupancy of family day care homes for children, except as specifically provided for in [the] chapter, and to *prohibit any restrictions relating to the use of single-family residences for family day care homes for children* except as provided by [the] chapter." (Health & Saf. Code, § 1597.40, subd. (a), italics added.) Subdivision (b) of section 1597.40 states: "Every provision in a written instrument entered into relating to real property which purports to forbid or restrict the . . . leasing . . . of the real property for use or occupancy as a family day care home for children, is void and every restriction or prohibition in any such written instrument as to the use or occupancy of the property as a family day care home for children is void." Subdivision (c) reads: "Except as provided in subdivision (d) [(addressing, among other things, the right of the landlord or property owner to increase the required security deposit)] every restriction or prohibition entered into, whether by way of covenant, condition upon use or occupancy, or

On January 22, 2007, Vineyard Creek's attorney, Jeffrey Breithaupt, responded to Morrison's Notice. He stated that the operation of a daycare business in her apartment would constitute a breach of the lease provision that required only private residential use of the premises. In his view, the protections of the Child Day Care Act applied to "single-family residences," not a multifamily apartment complex like Vineyard Creek. Breithaupt further notified Morrison that "[a]ny attempts by you to operate a family child care home out of your apartment is a breach of the residential lease/rental agreement and will result in litigation against you." Breithaupt invited Morrison or her attorney to contact him if she had any questions.

Morrison delayed the opening of her family childcare business and retained legal counsel at the Child Care Law Center.

By letter dated February 1, 2007, Attorney Claire Ramsey of the Child Care Law Center responded to Breithaupt. Ramsey opined that the Child Day Care Act did apply to multifamily apartment buildings.

Breithaupt replied to Ramsey by letter dated February 12, 2007. Breithaupt remained unconvinced that the Child Day Care Act, which specifically references "single-family residences," applied to apartment complexes, but invited Ramsey to provide any law to the contrary. Otherwise, he would "continue to advise [his] client to enjoin Mrs. Morrison from maintaining a family child care home at the Vineyard Creek Apartments."

More than two months later, on April 16, 2007, Morrison's attorneys responded that, after further research, they still believed that the Child Day Care Act applied to multifamily apartment complexes (or, perhaps more accurately, to apartments in a multifamily apartment complex). Ramsey "look[ed] forward to [Vineyard Creek's] favorable response by April 30, 2007." Otherwise, Ramsey threatened, Morrison would pursue litigation seeking equitable relief as well as damages for loss of income and retaliatory eviction.

On April 30, 2007, Breithaupt answered that the statute was "not suited to multi-family complexes." He noted: "As stated in the dicta of *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048 1055, 'The statute is tailored to the promotion of *family* day care homes appropriate to lots zoned for single-family dwelling (see [Health & Saf. Code,] § 1597.46) not commercial

---

upon transfer of title to real property, which restricts or prohibits directly, or indirectly limits, the acquisition, use, or occupancy of such property for a family day care home for children is void."

kindergartens.' "[2] Breithaupt asserted that the "issue is of primary importance to the owners of the apartments and they are willing to vigorously *defend against* any suit your Center or Sarah Morrison may bring." (Italics added.)

### A. The Lawsuit

On May 1, 2007, Morrison filed a verified complaint against Vineyard Creek, L.P., and numerous other defendants (collectively, Vineyard Creek), alleging violations of the Child Day Care Act (specifically, Health & Saf. Code, § 1597.40), California's antiretaliation statute (Civ. Code, § 1942.5), the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12955), and Business and Professions Code section 17200, as well as breach of the implied covenant of quiet enjoyment, negligence, and negligent infliction of emotional distress.[3]

In her complaint, Morrison sought an injunction enjoining defendants from evicting, discriminating against, or retaliating against Morrison. She also requested declaratory relief, damages for lost income and emotional distress, and "[c]osts of suit and reasonable attorneys fees."

On the same day she filed her complaint, Morrison opened her family daycare home in her apartment. Vineyard Creek did not take any action against her.

In mid-May 2007, shortly after the lawsuit was filed, Vineyard Creek retained new counsel. By the end of May, counsel reviewed the legislative history of the Child Day Care Act and concluded it was, in fact, intended to apply to apartments. On June 7, barely a month after the lawsuit was served, Vineyard Creek's counsel called Morrison's attorney and informed her that Vineyard Creek withdrew its opposition to Morrison's daycare home and agreed to compensate her for her actual damages. At this point, the parties had not engaged in any discovery or court hearings.

By letter dated June 29, 2007, Ramsey acknowledged Vineyard Creek's agreement that the Child Day Care Act applied to Morrison's situation, but

---

[2] Health & Safety Code section 1597.46, subdivision (a) precludes a city or county from prohibiting large family daycare homes on lots zoned for single-family dwellings.

[3] The complaint was filed against five named defendants besides Vineyard Creek, L.P. Morrison alleged that the property manager (Alkire) informed her by telephone "that she was not allowed to open a small child care home at Vineyard Creek Apartments" and subsequently asked Morrison's husband whether Morrison "had opened her family child care home." A leasing consultant (Williams) is alleged to have on one occasion driven by Morrison's apartment, "stopped her car, reversed, and looked into Ms. Morrison's apartment" before she drove off, and then did it again "approximately 15 minutes later." An assistant property manager (Chandra) was sued but was not alleged to have engaged in any specific act.

requested 10 concessions to resolve the case: (1) amend Morrison's lease to reflect her right to operate a family childcare home without fear of eviction or retaliation; (2) not harass Morrison, discriminate against her, or violate her right to operate a family childcare home; (3) give Morrison a right to renew her lease; (4) provide Morrison a positive letter of reference if she chose to vacate the apartment; (5) pay Morrison $12,500 in damages; (6) reimburse her for all costs she incurred in pursuing her legal rights in court; (7) include provisions in other Vineyard Creek leases reflecting the right to operate a family childcare home; (8) comply with all applicable fair housing laws; (9) enter into a stipulated judgment with continuing jurisdiction; and (10) agree that Morrison is entitled to recover her attorney fees.

On September 6, 2007, having not received a response to the settlement proposal, Morrison's attorneys sent to Vineyard Creek's attorney a letter and proposed settlement agreement. The letter clarified that Morrison's demand for $12,500 in damages included $6,000 for her actual damages, $4,000 for statutory damages "based on Ms. Morrison's discrimination and retaliation claims," and $2,500 for emotional distress. The letter warned that Morrison would commence discovery if the parties could not resolve the outstanding settlement issues soon.

In October 2007, Morrison's attorneys served 11 discovery demands, including form interrogatories, special interrogatories, and requests for production of documents, on five of the six defendants. Morrison also noticed the deposition of property manager Alkire and Vineyard Creek's former attorney, Breithaupt. Vineyard Creek requested extensions of time to respond to the discovery requests and ultimately provided responses that Morrison deemed insufficient.

Meanwhile, Vineyard Creek's attorneys sent a counteroffer on November 8, 2007, proposing a settlement of $7,000. The parties continued to negotiate.

In January 2008, Morrison's attorneys threatened to file a motion to compel further discovery responses from Vineyard Creek. Vineyard Creek asserted that the motion was unnecessary because further responses were "en route" and the discovery was needless anyway since the only remaining issue was proof of Morrison's damages. In February 2008, Morrison nonetheless filed a motion to compel production of documents and further responses to discovery. The motion to compel was granted as to two housing manuals.

Vineyard Creek propounded its own discovery, pertaining to the issue of Morrison's actual damages. Morrison was served and responded to two sets of form interrogatories and a set of special interrogatories. She was also served and complied with requests for production of documents, and Vineyard Creek took her deposition.

From January 2008 to at least March 2008, Vineyard Creek's counsel repeatedly requested evidence of Morrison's claimed damages, noting on one occasion his request "for some credible showing of true, actual damages as [his clients] were prepared to pay such in settlement."

On March 12, 2008, Vineyard Creek served 12 third party subpoenas on Morrison's clients, Morrison's former employers, and the "Community Care Licensing Division." According to Vineyard Creek's attorney, the subpoenas were tailored to the issue of Morrison's actual damages and were served only because Morrison's attorneys had not provided the requested evidence. Morrison filed a motion to quash the subpoenas, seeking to protect the privacy of her clients and to prevent the disclosure of confidential information about their children. The motion also sought to prevent former employers and the Community Care Licensing Division from disclosing certain records. The record does not indicate the outcome of the motion.

B. *Settlement*

In May 2008, three weeks before trial was scheduled to begin, the parties orally settled the case. On June 16, 2008, the parties signed a settlement agreement.

In the settlement agreement, Vineyard Creek did not admit liability or violation of any statute. To the contrary, the settlement agreement provided: "Defendants deny the entirety of Plaintiff's allegations. This Settlement Agreement does not constitute and shall not be deemed an admission of any wrongdoing or concession of any liability by Defendants as to Plaintiff's allegations."

Under the heading of "Health & Safety Code Compliance," Vineyard Creek agreed to recognize Morrison's right to operate a family childcare home in compliance with "all . . . Health and Safety Codes," agreed not to harass or discriminate against Morrison, and agreed to comply with all applicable Health and Safety Code sections regarding family childcare homes. Under the heading of "Fair Housing Compliance," Vineyard Creek agreed to comply with "all Fair Housing laws." Under the heading of "Tenant Protections," Vineyard Creek agreed to refrain from any and all retaliatory actions against Morrison. Vineyard Creek also agreed that Morrison could renew her lease for any period up to one year (assuming she was not otherwise in violation of the lease), and promised a letter of good standing as a tenant if and when she chose to vacate the apartment (assuming she was in good standing to qualify for such a letter). Although Morrison had demanded $12,500 in economic damages, Vineyard Creek agreed to pay $6,501. Vineyard Creek further agreed to resolve the matter by stipulated judgment

with a reservation of jurisdiction and to bifurcate the issues of costs and attorney fees. Morrison dropped her demands that Vineyard Creek amend her lease to reflect her right to operate a family childcare home and to add a provision to all leases at all properties owned or managed by Vineyard Creek confirming that tenants could operate licensed family daycare homes in their apartments.

The settlement agreement was approved by the trial court in February 2009. It appears from the register of actions that a judgment, at least as to most defendants, was entered in February 2009 as well.

### C. *Morrison's Motion for Attorney Fees*

In May 2009, Morrison filed a motion under Code of Civil Procedure section 1021.5 (private attorney general statute), Civil Code section 1942.5 (retaliatory eviction statute), and Government Code section 12989.2, subdivision (a) (FEHA), for attorney fees payable to her attorneys, including the Western Center on Law and Poverty, the Child Care Law Center, and private attorney Nancy Palandati. The motion requested $266,311.80 for work on the substantive case ($133,155.90 in attorney fees with a 2.0 multiplier), plus $29,231.50 for work on the attorney fees motion. As of the date of Morrison's reply brief in support of her motion (Sept. 28, 2009), Morrison was requesting $318,212.80 in attorney fees.

In a 14-page written decision, the trial court denied Morrison's motion for attorney fees. This appeal followed.[4]

---

[4] In support of her motion, Morrison had submitted declarations from four purported expert witnesses, who opined that many landlords in California misinterpret the Child Day Care Act and are confused about its application to multifamily dwellings, and the Morrison settlement helped tenants protect their rights to provide daycare in their homes. One of the declarants stated: "The settlement in the *Morrison* case positively impacts the family child care providers we regularly help. In addition, it impacts the parents and children who will use child care services. As a result of the *Morrison* settlement, Bananas Inc. staff can now provide definitive information to prospective and current family child care providers about their right to operate in rental property, regardless of whether it is a single-family home or a multi-unit dwelling. Moreover, distribution of the *Morrison* settlement to offending landlords helps diffuse threats of eviction against our clients who are living in rental housing." Morrison goes so far as to argue in her reply brief: "Through her settlement she secured guarantees for tenants throughout the state to operate family day care homes in rental multi-family housing without fear of eviction."

We, like the trial court, disagree with at least some of these assertions. The settlement had no precedential value. It did not result in legal findings or even acknowledgement of liability or any statutory violation. Nor did it resolve anything as to anybody other than Morrison (or, at most, with respect to rental properties owned by Vineyard Creek). In denying attorney fees under a private attorney general theory (Code Civ. Proc., § 1021.5), the court concluded that "the evidence in support of this case's conferring a significant benefit on the general public or a large class of persons appears to be totally speculative" and " '[t]o suggest that [Morrison's] attorneys have educated the masses, touted their victory, even shouted their message from the

## II. *Discussion*

Although the issue motivating this litigation was squarely based on whether the Child Day Care Act applied to an apartment in a multifamily apartment complex, the Child Day Care Act is not at issue in this appeal. We therefore do not decide whether, or to what extent, the Child Day Care Act validly applies to tenants seeking to operate family daycare homes in apartments in multifamily apartment complexes. Nor do we decide whether a private right of action may be implied from the statute.

At issue instead is whether the trial court should have awarded Morrison attorney fees under statutes other than the Child Day Care Act. We review the denial of Morrison's motion for attorney fees for an abuse of discretion. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 149 [50 Cal.Rptr.3d 273].) Although Morrison urges us to review the trial court's decision de novo, we would reach the same result if we applied de novo review. (See *Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 340 [62 Cal.Rptr.3d 780] [determination of *legal* basis for award of attorney fees is reviewed de novo as a question of law].)

As mentioned, Morrison asserted many causes of action in her complaint, including causes of action for violation of the Child Day Care Act, the antiretaliation statute, FEHA, the implied covenant of quiet enjoyment, negligence, and negligent infliction of emotional distress. Of these claims, the parties agree, only the antiretaliation statute and FEHA permit an award of attorney fees, and such an award is available only to the *prevailing* party.

Morrison prevailed in the *lawsuit,* in the sense that she obtained some of the relief she sought: Vineyard Creek agreed to allow her to remain in her apartment and to operate her family daycare home, and it also agreed to pay the damages Morrison allegedly incurred as a result of Vineyard Creek's delay in acknowledging her right to do so. The question, however, is whether Morrison was the prevailing party on *claims* for which she sought and could recover attorney fees: namely, her claims for violation of the antiretaliation statute and FEHA. (*Graciano v. Robinson Ford Sales, Inc., supra,* 144 Cal.App.4th at pp. 151–152.)

Because the dispute in this case was resolved by a settlement agreement rather than by adjudication, we begin by examining the settlement agreement. (See *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 684–686 [186 Cal.Rptr. 589, 652 P.2d 437] [a party may be a successful party

mountaintops, does not establish that a large class of people benefited from their shouting.' " Morrison does not challenge the court's denial of attorney fees under Code of Civil Procedure section 1021.5.

under Code Civ. Proc., § 1021.5, even if the litigation is resolved by settlement rather than by adjudication].)

### A. *Prevailing Party Under the Settlement Agreement*

In the matter before us, the settlement agreement does not state that Vineyard Creek violated the antiretaliation statute or FEHA, retaliated against Morrison for her assertion of her rights, or discriminated against her. To the contrary, the settlement agreement states: "Defendants deny the entirety of Plaintiff's allegations. This Settlement Agreement does not constitute and shall not be deemed an admission of any wrongdoing or concession of any liability by Defendants as to Plaintiff's allegations."

■ A settlement agreement might indicate that a party prevailed on one or more claims, even if the other party does not expressly admit it. (Cf. *Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 174 [17 Cal.Rptr.2d 510] [decided under Code Civ. Proc., § 1021.5].) The question, it is contended, is whether the claims "contributed substantially to remedying the conditions" at which the claims or lawsuit were directed. (*Ibid.*; see *Folsom v. Butte County Assn. of Governments, supra*, 32 Cal.3d at p. 671.)[5]

Morrison contends this standard was met, arguing that she ultimately obtained all the declaratory and injunctive relief she had requested in her complaint, plus $6,501 in damages. Upon examination, however, Morrison's argument is unpersuasive.

First, as to declaratory relief, Morrison is simply incorrect. She did not obtain any judicial declaration at all.

---

[5] Quoting *Planned Parenthood*, Morrison contends that "an 'opposing party's admission or nonadmission of liability is irrelevant' for the purposes of a statutory fee award." (*Planned Parenthood v. Aakhus, supra*, 14 Cal.App.4th at p. 174.) The court in that case actually stated: "An opposing party's admission or nonadmission of liability is irrelevant *for purposes of an award pursuant to [Code of Civil Procedure] section 1021.5.* [¶] The statute contains no language requiring as a prerequisite that the opposing party admit to legal wrongdoing." (*Ibid.*, italics added.) Code of Civil Procedure section 1021.5 is not at issue in this appeal. We will assume, without deciding, that this rule also applies where, as here, attorney fees are sought under Civil Code section 1942.5 or Government Code section 12989.2, subdivision (a). We will also assume, without deciding, that the standard for determining a "successful" party under Code of Civil Procedure section 1021.5 may be considered in determining the "prevailing" party under Civil Code section 1942.5 and Government Code section 12989.2, subdivision (a). (See *Donner Management Co. v. Schaffer* (2006) 142 Cal.App.4th 1296, 1310 [48 Cal.Rptr.3d 534] [discussing prevailing party standard where not defined by statute].) We make this assumption because the parties do not distinguish between a "successful" party and a "prevailing" party under the respective statutes, and any such distinction would not, in this case, affect the disposition of the appeal.

Second, as to injunctive relief, it is unclear that the antiretaliation and FEHA causes of action contributed substantially to Vineyard Creek's agreement to take or not to take certain actions. Vineyard Creek did agree to refrain from discriminating against Morrison, to comply with "all Fair Housing laws," and to refrain from any and all retaliatory actions against Morrison. This bears some similarity to the injunctive relief Morrison requested in the prayer of her complaint, albeit in much more general terms than the specific requests to enjoin Vineyard Creek from "[d]iscriminating against Ms. Morrison on account of her source of income"; and "[r]etaliating against Ms. Morrison for asserting her rights under the rental agreement and the law." It is highly questionable, however, that Vineyard Creek's general promises to comply with housing laws and to refrain from discriminating and retaliating against Morrison in the future are really traceable to the antiretaliation or FEHA claims themselves. The antiretaliation and FEHA claims explicitly sought relief for actions that had *already* occurred, they did *not* explicitly seek injunctive relief, and the antiretaliation statute does not even provide specifically for injunctive relief.[6] Moreover, Vineyard Creek's agreement not to discriminate or retaliate in the future would stem naturally from its recognition of Morrison's rights under the *Child Day Care Act* alone. Indeed, according to paragraph 38 of Morrison's complaint, Vineyard Creek's violation of the *Child Day Care Act* had resulted in the "threat of litigation against her for breaching her lease," suggesting that Vineyard Creek's agreement not to retaliate against Morrison stemmed from the merits of the claim under the Child Day Care Act. Morrison has not established that inclusion of the antiretaliation or FEHA claims in her lawsuit contributed substantially to the injunctive-type relief she obtained.

As to damages, Vineyard Creek ended up paying $6,501 "in satisfaction of all claims for damages and interest." While the settlement agreement notes that the payment *satisfies* all of Morrison's claims, the September 6, 2007 letter from Morrison's attorney, which was before the trial court, sheds light on what claims actually *led* to that payment. The letter explained that Morrison's demand for $12,500 in damages was comprised of $6,000 for Morrison's actual damages (delay in starting the daycare center), $4,000 for statutory damages "based on Ms. Morrison's *discrimination and retaliation claims,*" and $2,500 for emotional distress. (Italics added.) Although all claims sought recovery for actual damages, the fact that Vineyard Creek did

---

[6] Civil Code section 1942.5 provides in subdivision (f): "Any lessor or agent of a lessor who violates this section shall be liable to the lessee in a civil action for all of the following: [¶] (1) The actual damages sustained by the lessee. [¶] (2) Punitive damages in an amount of not less than one hundred dollars ($100) nor more than two thousand dollars ($2,000) for each retaliatory act where the lessor or agent has been guilty of fraud, oppression, or malice with respect to that act." By contrast, a plaintiff in a civil action filed under Government Code section 12989.1 may recover injunctive relief as well as actual and punitive damages. (Gov. Code, § 12989.2, subd. (a).)

not pay the $4,000 for statutory damages could lead to a reasonable inference that the $6,501 payment was for Morrison's damages as a result of the violation of the Child Day Care Act (plus interest), and not any amount towards her "discrimination and retaliation claims" under the antiretaliation statute or FEHA.

There is also some question whether it was really Morrison's lawsuit that got Morrison her relief. Before the lawsuit was filed, Vineyard Creek's attorney twice asked Ramsey for authority that would change his view as to the scope of the Child Day Care Act. Although Morrison's attorney knew of the legislative history that ultimately convinced Vineyard Creek to permit Morrison to operate her family daycare home, and referred to it generally in her April 16, 2007 letter, she did not actually provide the legislative history to Vineyard Creek before filing the lawsuit. We do not imply that she had any obligation to do so; but the fact is that this legislative history concerning the *Child Day Care Act*—not the assertion of the antiretaliation and FEHA claims—is what seemed to trigger Vineyard Creek's decision to permit Morrison to open her family daycare home and compensate Morrison for her damages. Once Vineyard Creek understood the scope of the Child Day Care Act, it made no effort to evict or harass Morrison or discriminate or retaliate against her, and there is no indication it would have done so absent the filing of the antiretaliation and FEHA claims.

In sum, based on the settlement agreement itself, Morrison did not establish that she was the prevailing party on the relevant claims.

In any event, the parties and the trial court have focused not on the settlement agreement, but on whether the evidence demonstrated that Vineyard Creek *in fact* violated the antiretaliation statute or FEHA. Morrison contends that "[t]he issues on appeal [include] (1) whether Vineyard Creek's threats of litigation for enforcing rights under the Day Care Act are unlawful under California's antiretaliation statute; [and] (2) whether FEHA protects tenants from discrimination based on source of income when using their property as authorized under the Day Care Act." Of course, consideration of the merits of Morrison's antiretaliation and FEHA claims makes a lot of sense. In the first place, the merits of those claims may be germane to whether they substantially contributed to Vineyard Creek consenting to the relief Morrison obtained. Furthermore, it would certainly be anomalous for a party to recover attorney fees under claims that had no merit, simply because the party obtained relief due to *other* claims for which attorney fees could not be awarded. We therefore turn to the merits of Morrison's claims.

## B. *Civil Code Section 1942.5*

Civil Code section 1942.5 provides for an award of "reasonable attorney's fees to the prevailing party" in "any action brought for damages for retaliatory eviction," where, as here, attorney fees are requested upon initiation of the action. (Civ. Code, § 1942.5, subd. (g).) Morrison's retaliatory eviction arguments are based on subdivision (c) of Civil Code section 1942.5.

Subdivision (c) of Civil Code section 1942.5 provides: "It is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or *threaten to do any of those acts*, for the purpose of retaliating against the lessee because he or she has lawfully organized or participated in a lessees' association or an organization advocating lessees' rights or has *lawfully and peaceably exercised any rights under the law*. In an action brought by or against the lessee pursuant to this subdivision, the lessee shall bear the burden of producing evidence that the lessor's conduct was, in fact, retaliatory." (Italics added.)

Morrison argues that she "lawfully and peaceably exercised [her] rights under the law" (Civ. Code, § 1942.5, subd. (c)) by advising Vineyard Creek that it could not restrict or prohibit her operation of a family childcare home in her apartment. She argues further that Vineyard Creek retaliated by its two letters, dated January 22 and February 12, 2007. By these letters, Morrison contends, Vineyard Creek (1) decreased residential services by preventing Morrison's lawful right to open a family daycare home; (2) threatened to cause her to vacate the premises involuntarily by not permitting her to operate the family daycare home; and (3) threatened to bring an action to recover possession of the apartment. The trial court, however, found there was no evidence that Vineyard Creek did any of those things.

Substantial evidence supports the finding that Vineyard Creek did not threaten to "increase rent, decrease services, cause a lessee to quit involuntarily, [or] bring an action to recover possession" in retaliation for Morrison's notice that she would operate a family daycare home. (Civ. Code, § 1942.5, subd. (c).) The January 22, 2007 letter from Vineyard Creek's attorney stated that Morrison's use of the unit as a family daycare home would constitute a breach of the lease and "result in litigation," and his February 12, 2007 letter stated that he would continue to advise his client to "enjoin [Morrison] from maintaining a family child care home." There is no mention of evicting Morrison, terminating her tenancy, or reducing services, and in context the reference to litigation pertains to enjoining her from operating the family childcare home in her apartment, not kicking her out of the apartment.

Morrison's arguments to the contrary are meritless. She contends that Civil Code section 1942.5, subdivision (c) protects tenants against behaviors that negatively effect, or threaten to effect, their tenancies, whether or not the landlord uses the word "eviction." The point, however, is not that Vineyard Creek never used the actual word "eviction," but that the concept of eviction was never communicated.

As to Vineyard Creek's January 22, 2007 letter, Morrison points to Breithaupt's language that an attempt to operate a family childcare home out of her apartment would be "a breach of the residential lease/rental agreement and will result in litigation against you."[7] Morrison argues: the lease agreement states that, upon breach, the owner might terminate the tenant's right to possession by lawful means; the lawful means for terminating a tenancy is through the unlawful detainer process; ergo, the letter threatened eviction. In essence, Morrison urges, an attorney's statement of his client's legal position concerning the interpretation of a lease and the tenant's planned activity constitutes actionable "retaliation."

■ Morrison's position is untenable. The law has not become so far removed from common sense that an owner of residential rental property (or his attorney) can no longer express his view on the provisions of a lease, and his intent to enforce them, when his tenant plans to do something the owner believes is a breach. This is not actionable "retaliation" under Civil Code section 1942.5, subdivision (c). (See *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1489 [74 Cal.Rptr.3d 1] (*Feldman*) [threats concerning contemplated unlawful detainer action were privileged and not the proper basis for retaliatory eviction claim].)

Morrison's view of Vineyard Creek's February 12, 2007 letter is also far off the mark. The letter stated that Vineyard Creek would "*enjoin* Mrs. Morrison from maintaining a family child care home at the Vineyard Creek Apartments and to take whatever steps are necessary to *enforce it.*" (Italics added.) Morrison argues that the statement, " 'to take whatever steps are necessary' " to enforce the injunction threatened to "decrease services, i.e. the lawful use of her unit." (See Civ. Code, § 1942.5, subd. (c).) However, if Vineyard Creek had obtained an injunction, enforcing the injunction would not diminish the *lawful* use of her unit, but implement it.[8]

---

[7] In her opening brief, Morrison claims that Vineyard Creek's attorney threatened "litigation against *her tenancy*" if she operated a family childcare home out of her apartment. The letter actually stated that such an operation in her apartment would result in "litigation against *you.*" (Italics added.)

[8] Morrison further contends that Vineyard Creek's silence, after her attorney asked for acknowledgement on April 16, 2007, that she could provide childcare in her home without fear of eviction, constituted retaliatory action. There is no evidence, however, to support the

■ Morrison also reminds us that Civil Code section 1942.5 "is a remedial statute aimed at protecting tenants from certain types of abuses" and "is to be 'liberally construed to effect its objectives and to suppress, not encourage, the mischief at which it was directed.' " (*Barela v. Superior Court* (1981) 30 Cal.3d 244, 251 [178 Cal.Rptr. 618, 636 P.2d 582].) But the " 'mischief at which [the statute] was directed' " certainly was not a landlord's attorney expressing an interpretation of a lease to a tenant whom he thinks is about to breach it. (*Id.* at pp. 247, 251–252 [Civ. Code, § 1942.5 applied where landlord served a three-day notice to quit and filed an unlawful detainer action after the tenant reported the landlord's molestation of the tenant's child to police]; see also *Newby v. Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 293 [131 Cal.Rptr. 547] [Civ. Code, § 1942.5 prohibits retaliation against a lessee for the exercise of a lessee's rights relating to the fitness of buildings for human occupancy and the lessor's duty to repair], disapproved on other grounds in *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 740–741, fn. 9 [180 Cal.Rptr. 496, 640 P.2d 115].)

Instructive in this regard is *Feldman, supra*, 160 Cal.App.4th 1467, which neither party has cited. There, a property owner filed an unlawful detainer action against its tenant and subtenants. (*Id.* at p. 1475.) The subtenants filed a cross-complaint for retaliatory eviction and numerous other causes of action, claiming among other things that the property owner's agent had made the following *threats before* any litigation was actually filed: the agent had prosecuted hundreds of evictions, so he knew the landlord would win; regardless of the outcome, the subtenants would never be able to rent another apartment in San Francisco; he knew the law and discussed the case with his uncle, a federal judge; and the subtenants would not be able to file a lawsuit because they would not win. (*Id.* at pp. 1474–1475.) The property owner filed an "anti-SLAPP" (strategic lawsuit against public participation) motion to strike the cross-complaint under Code of Civil Procedure section 425.16, on the ground that the cross-complaint arose out of protected First Amendment activity and the alleged wrongdoing was protected by the litigation privilege (Civ. Code, § 47). (*Feldman, supra*, at pp. 1475–1476.)

The Court of Appeal in *Feldman* held that the threats by the property owner's agent were within the scope of the anti-SLAPP statute, as communications in connection with an ongoing dispute and in anticipation of litigation. (*Feldman, supra*, 160 Cal.App.4th at p. 1481; see Code Civ. Proc., § 425.16, subd. (e).) The court further held that the alleged threats were

---

inference appellant urges that Vineyard Creek's silence in the two weeks between the April 16 letter and the ensuing lawsuit was *retaliation* for purposes of Code of Civil Procedure section 1942.5, subdivision (c).

absolutely privileged under Civil Code section 47, as prelitigation communications relating to litigation that is contemplated in good faith and under serious consideration. (*Feldman, supra,* at pp. 1487, 1489.) The court explained: "Whether taken individually or as a whole, [the owner's agent's] statements were clearly connected to and made in anticipation of the eviction action they threatened. Whether done maliciously or without reasonable grounds to believe that the [subtenants] were unlawful occupants of the premises, *the statements were privileged.*" (*Id.* at p. 1489, italics added.) The court held that the subtenants' retaliatory eviction claim had no merit and was properly stricken, in part because the property owner had not taken any action or made any statements independent of the eviction litigation and the assertion of the right to occupy the apartment, such that all the bases for the retaliation claim were privileged. (*Id.* at p. 1492.)[9]

As applied here, *Feldman* teaches that the statements by Vineyard Creek's attorney are not a valid basis for Morrison's antiretaliation claim under Civil Code section 1942.5. Morrison had explicitly premised her claim on Breithaupt's statements in his January and February letters, which threatened to bring legal action for the purpose of enforcing the lease provision at issue or, in Morrison's view, to evict her. These statements were plainly communications in furtherance of the object of the contemplated litigation. (See *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 282–283 [67 Cal.Rptr.3d 190] [landlord's service of notice terminating a tenancy, and his refusal to rescind it even after the tenants informed him they constituted a protected household due to their age or disability and length of tenancy, constituted petitioning activity protected by the anti-SLAPP statute].)[10]

■ In fact, one need look no further than subdivision (e) of Civil Code section 1942.5 to understand the point. That provision permits a lessor to recover possession of a dwelling and to do any of the acts described in subdivision (c) "if the notice of termination, rent increase, or *other act,* and any pleading or statement of issues in an arbitration, if any, *states the ground upon which the lessor, in good faith,* seeks to recover possession, increase rent, or do any of the other acts described in subdivision . . . (c)." (Civ. Code, § 1942.5, subd. (e), italics added.)

---

[9] The court also found the retaliation claim to be meritless because the threats could not have been in retaliation for the subtenants' exercise of their rights under the sublease, since the threats preceded the subtenants' assertion that the sublease was valid. (*Feldman, supra,* 160 Cal.App.4th at pp. 1492–1493.) Nonetheless, the litigation privilege was sufficient in itself to preclude liability for retaliatory eviction in *Feldman,* and it is sufficient to preclude liability here as well.

[10] Ironically, if Vineyard Creek had filed a special motion to strike Morrison's antiretaliation and FEHA claims under Code of Civil Procedure section 425.16 and prevailed, Vineyard Creek would have recovered *its* attorney fees *from Morrison.* (Code Civ. Proc., § 425.16, subd. (c).)

Vineyard Creek's letters stated its position (whether legally correct or not) in good faith. Indeed, there is no evidence that Vineyard Creek acted in bad faith. By Morrison's own assertion, it was not readily apparent whether the Child Day Care Act—which at times (including in its statement of legislative intent) refers to "single-family residences"—applied to multifamily dwellings. Declarations submitted by Morrison in support of her motion for attorney fees indicated there was confusion among landlords over whether the Child Day Care Act applied to multifamily dwellings, and Attorney Ramsey of the Child Care Law Center had to conduct what she termed "exhaustive" research into the statutes and their legislative history to resolve this issue of "first impression." When Vineyard Creek learned of the legislative history, it promptly permitted Morrison to proceed with her family childcare home and offered to compensate her for her loss.

At any rate, Morrison's insistence that Vineyard Creek's letters should be interpreted to threaten a retaliatory eviction, decrease in services, or other wrongdoing is merely an argument that the trial court should have drawn an alternative inference from the evidence. That does not compel reversal. " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682 [76 Cal.Rptr.2d 691].)

The court did not err in denying attorney fees under Civil Code section 1942.5.

### C. *Government Code Section 12989.2*

■ Government Code section 12989.2 provides that the "court may, at its discretion, award the prevailing party . . . reasonable attorney's fees and costs" in a civil action brought under Government Code section 12989 or 12989.1 for a discriminatory housing practice under FEHA. (Gov. Code, § 12989.2, subd. (a).) In her complaint, Morrison alleged a discriminatory housing practice prohibited by Government Code section 12955, contending that Vineyard Creek discriminated against her based on her source of income.

■ Government Code section 12955, subdivision (a), makes it unlawful "[f]or the owner of any housing accommodation to discriminate against or harass any person because of the race, color, religion, sex, sexual orientation,

marital status, national origin, ancestry, familial status, *source of income*, or disability of that person." (Italics added.)[11]

The legislative purpose behind the inclusion of the "source of income" language was to curb a growing trend among landlords to refuse to rent to anyone on "Section 8" housing or evict an existing Section 8 tenant because the landlord no longer wanted to accept Section 8 vouchers. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, p. 6; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended July 8, 1999, pp. 6–7.)

There is no evidence whatsoever that Vineyard Creek harassed or discriminated against Morrison because the source of her income was going to be a family daycare home, as opposed to some other source.

First, Vineyard Creek's objection to Morrison running a family daycare home was not based on the source of her income, but on the fact that her lease expressly limited her use of the apartment to private residential purposes. Similarly, Morrison's lease with Vineyard Creek did not preclude any particular source of income, but all nonresidential use of the apartment. Vineyard Creek cared about how she was going to use the apartment, not where she got the money to pay her rent. In fact, the trial court found, if Morrison had stated she wanted to open a *free* daycare home, Vineyard Creek still would have objected.

Second, when Morrison applied for the apartment, Vineyard Creek was aware that Morrison's primary source of income was from her work as a childcare provider (as a nanny). Vineyard Creek nonetheless rented the apartment to her without objecting to that source of income. While working as a nanny may not be the same as operating a family daycare home, a trier of fact could reasonably infer from this evidence that Vineyard Creek had no objection to Morrison paying her rent from funds earned in her operations of a family daycare home.

Third, Vineyard Creek did not discriminate against Morrison based on the type of business she wanted to run out of her apartment, because Vineyard Creek's prohibition was against *all* nonresidential uses, not just family daycare homes. Nor is there any evidence whatsoever that Vineyard Creek

---

[11] Similarly, Government Code section 12955, subdivision (f) makes it unlawful "[f]or any owner of housing accommodations to harass, evict, or otherwise discriminate against any person in the sale or rental of housing accommodations when the owner's dominant purpose is retaliation against a person who has opposed practices unlawful under this section . . . ." " '[S]ource of income' means lawful, verifiable income paid directly to a tenant . . . ." (Gov. Code, § 12955, subd. (p)(1).)

put the residential use provision in its lease as a ploy to keep people from opening family daycare homes in particular. As the trial court found, no matter what kind of nonresidential use Morrison had sought for her apartment, and whether that nonresidential use was for the purpose of generating income or not, Vineyard Creek would have objected.

■ Morrison argues that a property owner cannot engage in discriminatory treatment under the guise of demanding compliance with its own residential rules and regulations. (*Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Com.* (2004) 121 Cal.App.4th 1578, 1593–1595 [18 Cal.Rptr.3d 669].) But that does not mean that seeking compliance with its own residential rules and regulations establishes unlawful discriminatory treatment. The fact is Vineyard Creek was not treating Morrison any differently than anyone else because of the way she was going to make money to pay the rent, but because of the way she was going to use her apartment.

Lastly, Morrison contends the trial court mistakenly thought that Government Code section 12955 banned discrimination based on source of income only with respect to prospective tenants. We disagree with Morrison's reading of the record. The trial court found there "was no discrimination, based on income or otherwise, before the decision to rent to plaintiff, *and no discrimination based on source of income*." (Italics added.) In any event, substantial evidence supported the conclusion that there was no discrimination under Government Code section 12955.

The trial court did not err in declining to award Morrison attorney fees.[12]

---

[12] Vineyard Creek contends the denial of Morrison's fee request was also proper because Morrison's request was for such an unreasonable amount. (Citing *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 976 [104 Cal.Rptr.3d 710, 224 P.3d 41] ["in light of plaintiff's minimal success and grossly inflated attorney fee request, the trial court did not abuse its discretion in denying attorney fees"]; *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 [186 Cal.Rptr. 754, 652 P.2d 985] ["[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether"]; *Abouab v. City and County of San Francisco* (2006) 141 Cal.App.4th 643, 674 [46 Cal.Rptr.3d 206] [upholding denial of attorney fees]; *Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 324 [103 Cal.Rptr.2d 339] [Sometimes "a reasonable fee is zero, especially where the recovery is de minimis, establishes no important precedent and does not change the relationship of the parties"].) Vineyard Creek argues that the case was essentially settled in June 2007 when it withdrew its opposition to Morrison's child daycare home and agreed to pay her actual losses; it also asserts an expert witness opined that Morrison's attorneys' actions were unreasonable, their charges were excessive, duplicative, and largely unnecessary, and no complaint needed to have been filed at all. In its order denying fees, the trial court described Morrison's role in "tenaciously and unreasonably" litigating the case as the reason why the lawsuit "lasted so long and cost so much," and "it appeared likely that [Morrison's] attorneys were trying to dig

### III. *Disposition*

The order is affirmed.

Jones, P. J., and Bruiniers, J., concurred.

---

up information on defendants by which they could bring additional litigation against them in the future." Morrison disputes these assertions. We need not and do not address this issue to resolve the appeal.