Filed 6/23/26  Yang v. Zhu CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WEN YANG et al., <br><br>  Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> YUN ZHU, <br><br>  Defendant, Cross-complainant and Appellant. | A172055, A173090 <br><br> (Alameda County Super. Ct. No. RG15794796) |
| WEN YANG et al., <br><br>  Plaintiffs, Cross-defendants and Respondents, <br><br> v. <br><br> YUN ZHU, <br><br>  Defendant, Cross-complainant and Appellant. | A172602 <br><br> (Alameda County Super. Ct. No. RG15794796) |

Wen Yang and Yun Zhu formed a corporation, Y&Y Educare Development, Inc. (Y&Y), for the purpose of establishing a preschool.  After their relationship deteriorated, Yang filed papers to dissolve Y&Y, initiated this lawsuit against Zhu, established a new preschool business (LWY Educare, Inc.), and negotiated with Y&Y's lessor to take over the space Y&Y had obtained for its preschool.  Yang and LWY Educare, Inc. (collectively "Yang"), appeal from the trial court's entry of

1

judgment for Zhu based on Zhu's cross claim against Yang for breach of fiduciary duty. Zhu also appeals, challenging the trial court's decision as to remedy. We conditionally vacate the judgment and remand for the trial court to consider the merits of Yang's affirmative defense of unclean hands.

## BACKGROUND

### A.

Yang was a teacher at Zhu's daughter's former preschool. A few years after they met, the two decided to establish a preschool or afterschool care business together, leveraging Yang's teaching background and Zhu's background in architectural design, including her experience designing buildings for preschool and afterschool projects. They agreed that Zhu would be primarily responsible for managing the site selection and construction/renovation process, and Yang would be responsible for obtaining a license to operate the preschool and setting up and running the school.

The pair filed articles of incorporation to form Y&Y. Yang and Zhu were its only officers and directors. They selected the name "Laughter Educare" for their school and registered the name for use by Y&Y. The pair agreed to be 50/50 shareholders, contributing equal cash investments, time, and labor into the project. Neither would be compensated for the work they performed prior to the opening of the preschool.

The two agreed on a location in Fremont that used to house another preschool, owned by a company called Yo-Yo Learning Center, that had suffered an accident in which a cabinet fell and injured two children. Although the location needed substantial work to address numerous building code violations, the site was attractive due to its outdoor playground and its proximity to a Tesla factory, planned housing developments, public transportation, and elementary schools.

Zhu and Yang negotiated with Nangyau Tay, the owner of Yo-Yo Learning Center, to purchase Yo-Yo and the right to sublease its preschool site (units seven and eight). Tay accepted an offer of $100,000, which included $70,000 for the site and $30,000 for the cost of the renovation permit Tay had applied for from the City of Fremont.

Zhu and Yang's relationship began deteriorating after Yang learned that Zhu had engaged in separate dealings with Tay that would result in Zhu receiving thousands of dollars in income. Yang believed that Zhu was receiving "kickback[s]" for referring business from Y&Y. According to Zhu, Tay had contracted her to do work on another unit (unit six) not being leased by Y&Y. Zhu had also contracted with Tay to prepare plans to fix code violations in units six, seven, and eight and submit them to the City in exchange for $25,000. Yang believed that any work Zhu did on units seven and eight belonged to Y&Y.

The situation was further complicated when Tay's permit application was denied. Yang insisted that the agreed-upon $100,000 purchase price be reduced by $30,000. Zhu agreed to use $15,000 she would have received for her contract work on units seven and eight to reduce the Yo-Yo purchase price from $100,000 to $85,000. As a result, the parties signed a sales agreement to purchase Yo-Yo for $85,000, including the right to sublease its premises. Y&Y subsequently entered into a sublease agreement with Tay under which it would pay monthly rent for units seven and eight.[1]

In the meantime, Zhu completed the renovation plans for units six, seven, and eight, obtained the necessary building permit from the City, and solicited contractor bids for the

[1] Zhu and Yang later reached an agreement with Tay to sublease unit six for Y&Y as well, which resulted in lowering the purchase price of Yo-Yo from $85,000 to $70,000 to account for the amount that Tay owed for remodeling unit six.

3

renovation work. Rather than hire any of the contractors from whom Zhu had obtained bids, however, the parties hired a contractor named Jack Li who had been recommended to Yang by a friend. Zhu and Yang agreed to hire Li despite concerns about his low bid and lack of a contractor's license; the contract with Li was never reduced to writing.

Unfortunately, Li's work was substandard. Li lacked knowledge necessary to complete the work, mistakenly demolished a wall that was not supposed to be removed, and disputed the scope of the work. Zhu and Yang fired Li and hired a different contractor, John Bui, to compete the remaining work, again with no written contract. Bui paid Zhu $1,000, which Yang understood was a "kickback" for giving the business to him. Bui successfully completed the work, which was then approved by the City.

Despite the setbacks during the renovation process, Yang and Zhu were able to obtain the license necessary to open their preschool. However, Yang blamed Zhu for delays in the construction process and accused her of taking "secret kickbacks" and breaching her fiduciary duties to the corporation. The relationship between the two broke down, and they began discussing the possibility that Y&Y would have to be dissolved. They were unable to agree on how to proceed. After suing Zhu in November 2015, Yang filed paperwork with the Secretary of State to wind up and dissolve Y&Y. Yang incorporated a new company ("LWY") without Zhu, negotiated with Tay on behalf of her new business, took over Y&Y's sublease and "Laughter Educare" business name, applied for a new preschool license, and ultimately operated a new preschool out of the space that Y&Y had planned to use. Yang also locked Zhu out of the preschool site and denied her access to Y&Y's bank account by changing the login credentials.

4

While Yang was moving ahead with her new business, Y&Y had run out of money, and Zhu was unwilling to contribute more money to pay her half of the sublease rent because Yang had already filed paperwork to dissolve Y&Y. After Tay served Y&Y with a three-day notice to pay rent or quit, Y&Y ultimately did not complete its purchase of Yo-Yo.

**B.**

Yang's lawsuit against Zhu asserted claims for intentional misrepresentation, fraudulent concealment, breach of fiduciary duty, intentional infliction of emotional distress, conversion, contract rescission, and accounting of equity. Yang alleged in part that Zhu had misrepresented herself as an architect, caused unnecessary delays, engaged in and concealed double-dealing with Tay, and received and concealed kickbacks from Tay and other contractors that should have passed to Y&Y. However, the trial court ultimately dismissed Yang's suit for failure to bring it to trial within five years, as required by Code of Civil Procedure section 583.310.

Zhu also filed a cross-complaint against Yang and her new company, LWY, alleging that Yang misappropriated Y&Y's assets and started her own company in direct competition with Y&Y. She asserted derivative claims on behalf of Y&Y, as well as her own individual claims, for breach of fiduciary duty, conversion, fraud, unfair competition, an accounting, imposition of a constructive trust, and declaratory relief. Zhu dismissed her individual claims so that by the time of trial, the only remaining claims were derivative.

After a bench trial, the trial court ruled in Zhu's favor on her derivative claim for breach of fiduciary duty. The court found that Yang had harmed Y&Y by unilaterally filing dissolution papers for Y&Y and negotiating with Tay to obtain Y&Y's sublease on behalf of her new business. Although Yang had raised affirmative defenses including unclean hands, the trial

5

court held that her unclean hands defense was not relevant because her complaint against Zhu had had already been dismissed, and the only remaining questions were about whether Yang had acted wrongfully.

Based on Zhu's expert's valuation of Y&Y's reasonable fair market value in or around February 2016, the trial court awarded Y&Y damages in the amount of $461,000 and declined to award two equitable remedies sought by Zhu, disgorgement of profits and imposition of a constructive trust. In addition, the court granted Zhu's request for attorney fees. The court ordered that "[a]fter collection of th[e] judgment and payment of any outstanding debts," Y&Y's "assets shall be distributed to its two shareholders according to their agreed upon 50% interest in said company in accordance with the dissolution" of Y&Y.

Subsequently, both Yang and Zhu filed motions to vacate the judgment. The trial court denied Yang's motion. Granting Zhu's motion in part, the court corrected a typographical error, deleted a sentence stating that Zhu had abandoned her request for an accounting, and added a sentence indicating that the court's decision made no determination about the proper distribution of the attorney fee award as between Y&Y's shareholders.

## DISCUSSION

### A.

### 1.

In her appeal, Yang challenges the sufficiency of the evidence that she harmed Y&Y by breaching her fiduciary duties. She also challenges the sufficiency of the evidence supporting the trial court's valuation of Y&Y for purposes of the damage award. Her challenges lack merit.

6

Yang does not dispute that an officer of a corporation may not misappropriate a business opportunity or establish a competing enterprise to the corporation's detriment. (See *Sequoia Vacuum Systems v. Stransky* (1964) 229 Cal.App.2d 281, 286; see also *Center for Healthcare Education & Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1132 (*Center for Healthcare*).) Instead, she contends that the trial court "ignored" evidence that her actions were "emergency remedial measures . . . triggered by Zhu's misconduct." Whether Yang violated her duty of loyalty is a question of fact, so we review the trial court's decision for substantial evidence. (See *Kelegian v. Mgrdichian* (1995) 33 Cal. App.4th 982, 988-990.)

Substantial evidence supports the trial court's findings. The trial court found that beginning in December 2015, Yang sought to dissolve Y&Y and took multiple steps to establish a competing business that would take over Y&Y's site. The court found that she filed a fictitious business name statement on behalf of her new business, taking Y&Y's Laughter Educare name; solicited students for her new preschool; negotiated with Tay to sublease the same space that, at that time, was still leased to Y&Y; and urged Tay to serve Y&Y with a three-day notice to quit. The court further found that Yang remained an officer of Y&Y throughout this period and that her actions, which culminated in Y&Y's sublease being taken over by LWY, harmed Y&Y. And the court found, based on an extensive analysis of expert evidence, that Y&Y was valued at $461,000.

Moreover, Yang fails to discuss the evidence supporting the trial court's decision. Her briefing discusses only the evidence favorable to her position, without addressing the evidence to the contrary, upon which the court relied. A party challenging the sufficiency of the evidence must summarize the key evidence, both favorable and unfavorable—a requirement that is even more

7

important in cases that, like this one, involve an extensive record. (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888; *Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 650; Cal. Rules of Court, rule 8.204(a)(2)(C).) Yang thus forfeits her argument. (*In re Marriage of Fink,* at pp. 887-888.)

## 2.

### a.

Yang correctly contends that the trial court committed legal error in declining to consider her unclean hands defense because, in the court's words, it was "irrelevant" to the derivative shareholders' claims.

The doctrine of unclean hands is a defense that precludes a party who has engaged in misconduct from obtaining equitable or legal relief. (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 685.) Unclean hands " 'is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim.' " (*Ibid*.) The doctrine applies only when the misconduct at issue is closely related to the same party's claimed injuries, such that the misconduct has "infect[ed] the cause of action involved and affect[ed] the equitable relations between the litigants." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979, 984, as modified on denial of rehg. Jan. 3, 2000.) This assessment is "a question of fact." (*Id.* at p. 978; see also *Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 436, 438.) Further, "the decision whether to apply the [unclean hands] defense based on the facts presented is a matter within the trial court's discretion." (See *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1044 (*Garcia*).)

Contrary to the trial court's conclusion, the unclean hands defense is not irrelevant here, as the doctrine has long been applied to shareholder's derivative actions. (See *DeGarmo v.*

8

*Goldman* (1942) 19 Cal.2d 755, 764-765; *Rosenfeld v. Zimmer* (1953) 116 Cal.App.2d 719, 723; see also, e.g., *Sirott v. Superior Court* (2022) 78 Cal.App.5th 371, 380.)

Zhu argues that Yang's unclean hands defense lacks merit in any event because the wrongdoing Yang alleges is not sufficiently related to Zhu's claim. But whether or not Yang's allegations are factually supported and whether, based on the facts found, the unclean hands defense ought to be applied here are decisions for the trial court in the first instance. (Cf. *Garcia*, *supra*, 183 Cal.App.4th at p. 1044 [stating that where "[t]he trial court issued no ruling on" a party's unclean hands argument, the court of appeal "will not do so for the first time on appeal"].) We will therefore order a conditional remand for the trial court to assess Yang's unclean hands defense.

We note that the trial court made some factual findings that appear to contradict or reject some of Yang's allegations of Zhu's wrongdoing, even though the court did not reach the merits of the unclean hands defense. We shall leave it to the trial court to determine, on remand, the scope of the remaining issues. The court should make any necessary further factual findings and exercise its discretion to determine whether to deny recovery here based on fairness principles.

Because the trial court may determine on remand that Yang's unclean hands defense lacks merit, we will address the parties' remaining contentions.

**b.**

Yang contends that she is entitled to a remand for the trial court to consider her affirmative defense that the amount of any recovery should be offset by amounts allegedly owed by Zhu to "either Y&Y or Yang." We are unpersuaded.

A defendant may raise a claim for relief as an affirmative defense, alleging, "in effect, that the defense claim constituted

prior payment for the plaintiff's claim and therefore should be set off against any award in the plaintiff's favor." (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 192, 197-198; see also Code Civ. Proc., § 431.70.) A setoff does not change the amount of the damages award for the plaintiff's claim, but it affects the plaintiff's right to recover the full amount of the award. (See *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 534; see also *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 500.) A trial court has discretion to determine whether allowing a setoff would be equitable under the circumstances. (See *Wm. R. Clarke Corp. v. Safeco Ins. Co. of Am.* (2000) 78 Cal.App.4th 355, 358-359.)

Here, the trial court's statement of decision did not mention Yang's setoff claim, nor did its tentative decision. Although Yang submitted numerous objections to the tentative decision and, after the decision was issued, filed a motion to vacate the judgment, our review of the record has not identified any point at which she brought the omission of the setoff claim to the trial court's attention.

Where an objection could have been, but was not, made to the trial court's error, an appellate court will not ordinarily consider the assertion of error. (See *Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 693 (*Cabrini Villas*); see also *San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, 436 [" ' " 'The critical point for preservation of claims on appeal is that the asserted error must have been brought to the attention of the trial court.' " ' "].) It is inefficient and unfair to the trial court, as well as to the other party, for the appellant to exploit an alleged error on appeal that could have easily been corrected in the trial court. (*Cabrini Villas*, at p. 693.) Further, it is the appellant's burden to establish, by citation to the record, that the error was raised to

10

the trial court.  (See *Mattson Technology, Inc. v. Applied Materials*, Inc. (2023) 96 Cal.App.5th 1149, 1160; *In re S.C.* (2006) 138 Cal.App.4th 396, 406.)  Because Yang has not met this burden, we will not consider her contentions concerning her setoff claim.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"].)

**3.**

Yang contends that the trial court erred in awarding attorney fees pursuant to two equitable doctrines known as the common fund and substantial benefit doctrines.  We discern no error.

Although the default rule is that each litigant bears her own attorney fees unless provided for by contract or statute, the common fund and substantial benefit doctrines are equitable exceptions to that rule.  (See Code Civ. Proc., § 1021; *Abouab v. City and County of San Francisco* (2006) 141 Cal.App.4th 643, 661-662 (*Abouab).*)  Under the common fund theory, a winning party whose litigation creates or preserves a fund benefitting a group of passive beneficiaries may receive an attorney fee award out of that fund, which serves to spread the litigation costs amongst the beneficiaries.  (*Abouab*, at p. 662; see also *Serrano v. Priest* (1977) 20 Cal.3d 25, 34-35.)  Under the related substantial benefit theory, "the law is settled that derivative plaintiffs may recover their expenses" from the corporation "upon showing their efforts resulted in a monetary recovery for the corporation or otherwise conferred a ' "substantial benefit" ' upon the corporation."  (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1118 (*Grosset*); see also *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 943 (*Woodland Hills*); *Abouab*, at p. 662; *Fletcher v. A. J. Industries Inc.* (1968) 266 Cal.App.2d 313, 320.)

11

Both doctrines are based "on the principle that those who have been 'unjustly enriched' at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained." (*Woodland Hills*, *supra*, 23 Cal.3d at pp. 943, 945; *Abouab*, *supra*, 141 Cal.App.4th at p. 662.) The substantial benefit doctrine also rests on the notion that " 'the corporation which has received the benefit of the attorney's services should pay the reasonable value thereof.' " (*Mills v. Elec. Auto-Lite Co.* (1970) 396 U.S. 375, 390 (*Mills*); see also *Save El Toro Assn. v. Days* (1979) 98 Cal.App.3d 544, 549.) Where the litigation resulted only in a personal benefit to the plaintiff, however, a fee award is not appropriate under either doctrine. (See *Baker v. Pratt* (1986) 176 Cal.App.3d 370, 379-380 (*Baker*); *Cziraki v. Thunder Cats, Inc.* (2003) 111 Cal.App.4th 552, 558 (*Cziraki*).) In deciding whether to award fees, the trial court must "[e]xercis[e] its equitable discretion . . . [to] determine[] whether the interests of justice require those who received a benefit to contribute to the legal expenses of those who secured the benefit." (*Pipefitters Local No. 636 Defined Benefit Plan v. Oakley, Inc.* (2010) 180 Cal.App.4th 1542, 1547 (*Pipefitters*); see also *Woodland Hills*, at p. 943.) We independently review legal questions as to the proper criteria for an attorney fee award, but "we defer to the trial court's discretion in determining how they are to be exercised" under the circumstances. (*Pipefitters,* at p. 1547.)

Yang contends that the trial court committed a legal error because the common fund and substantial benefit doctrines can never be applied in derivative suits involving only two shareholders. She relies on *Baker, supra,* 176 Cal.App.3d 370, a case that considered whether a successful shareholder in a derivative action for involuntary dissolution against the corporation's only other shareholder was entitled to have his attorney fees paid out of the corporation's recovery. The court's judgment included an award of nearly $400,000 to the

12

corporation, as well as an award of $53,500 to the plaintiff individually.  (*Id.* at pp. 376-377.)  Concluding that an attorney fee award was not appropriate, *Baker* reasoned that under the circumstances, the defendant shareholder's misappropriation of corporate assets harmed only the plaintiff, and the plaintiff's objective was " 'not to secure or preserve a common fund but to establish personal adverse interests therein.' "  (*Id.* at p. 379.)  Nor was there a class of identifiable persons, apart from the parties already represented in the litigation, who would stand to receive a substantial benefit.  (*Id.* at pp. 379-380.)

Zhu urges us to follow *Cziraki*, *supra*, 111 Cal.App.4th 552, which disagreed with *Baker*.  *Cziraki* affirmed an attorney fee award to a successful plaintiff in a derivative action involving a corporation with only three shareholders, two of whom were the defendants.  (See *id.* at pp. 554-555, 559-565.)  As a result of the judgment obtained by the plaintiff, the corporation in *Cziraki* gained certain patent interests, the chance to take advantage of those interests, the preservation of company resources, and an interest in potential future profits.  (*Id.* at p. 560.)  The trial court did not award any individual damages to the plaintiff.  (*Id.* at p. 555.)  Rejecting the argument that the plaintiff was the only person who would benefit from the judgment, *Cziraki* reasoned that the plaintiff had obtained no individual benefit, and that the benefits he had won for the corporation would be shared equally by the shareholders.  (*Id.* at p. 559.)  Even though the judgment would be paid by the other two shareholders, the corporation "benefits regardless of the effect of the judgment on individual shareholders."  (*Id.* at p. 564.)  Unlike in *Baker*, the case did not involve the dissolution of the corporation, so "any award to [the corporation] would not be immediately passed on to individual shareholders through a dissolution proceeding."  (*Cziraki*, at p. 561.)  Further, there was no finding that the plaintiff in *Cziraki* was "in reality" pursuing a personal interest.  (*Ibid*.)

13

*Cziraki* also reviewed case law from numerous jurisdictions concerning attorney fees in derivative suits involving corporations with only two or three shareholders, and it concluded that the weight of authority favored the availability of attorney fees in such cases. (See *Cziraki*, *supra*, 111 Cal.App.4th at pp. 561-564; see also, e.g., *Jones v. Uris Sales Corp.* (2d Cir. 1967) 373 F.2d 644, 648 [holding that the corporation was liable for the plaintiff's attorney fees where it had two shareholders because "the reason for the award of such fees in a stockholder's derivative suit [is] that the plaintiff's efforts have conferred on the corporation a benefit for which the corporation would otherwise have had to pay itself"].) *Cziraki* held that, contrary to the conclusion in *Baker*, "[w]hen a corporation is the sole beneficiary of a derivative shareholder suit, . . . it should bear the costs associated with obtaining that benefit." (*Cziraki*, at p. 563.) *Cziraki* declined to treat "*Baker* as a blanket rule disallowing attorney fee awards in any derivative suit merely because the litigation involves the entire class of shareholders in a close corporation." (*Cziraki,* at p. 565.)

We agree with *Cziraki* that *Baker* should not be understood as establishing a categorical rule that would preclude an award of fees in derivative actions involving close corporations. In the circumstances here, the trial court had equitable discretion to determine whether a fee award in this derivative action would best serve the interests of justice. (See *Pipefitters*, *supra*, 180 Cal.App.4th at p. 1547; see also *Grosset*, *supra*, 42 Cal.4th at p. 1118.) Unlike in *Baker*, the trial court found that Zhu was not litigating to vindicate personal interests, noting that she had dismissed any individual claims. Further, the court reasoned that, under its ruling, Yang was entitled to a 50 percent share of the judgment, so "all shareholders benefit from the litigation advanced on behalf of Y & Y." The trial court's fee award is fully consistent with the substantial benefit doctrine, under which the corporation receiving the benefit of the litigation should bear the

14

cost of securing it. (See *Mills*, *supra*, 396 U.S. at p. 390; *Woodland Hills*, *supra*, 23 Cal.3d at pp. 943, 945.) Pursuant to that doctrine, it is Y&Y—rather than Yang individually—that pays the fees. (See *Cziraki*, *supra*, 111 Cal.App.4th at p. 563.) Although the corporation has been dissolved, the cost-spreading purpose underlying the doctrine is still served: the award does not shift the winner's fees to the losing party; instead, *both* shareholders of Y&Y will split the bill equally. (See *Glenn v. Hoteltron Sys., Inc.* (NY 1989) 74 N.Y.2d 386, 390, 393 [holding that, where the defendant shareholder of a two-shareholder corporation had breached his fiduciary duties by looting the corporation's assets to benefit another corporation wholly owned by the defendant, the plaintiff shareholder's attorney fees should be paid out of the corporation's damages award].) We discern no abuse of discretion in the trial court's fee award.

Finally, Yang's appeal seeks to clarify that the trial court's fee award did not run against her personally, but instead ran against her newly formed corporation, LWY. The fee award runs against Y&Y, however, not against Yang personally or her new corporation. Zhu concedes that the fee award should be paid out of the damages judgment awarded to Y&Y. Because we affirm the trial court's fee award based on the substantial benefit doctrine, we agree with Zhu that the fee award must be paid by Y&Y, the corporation that received the benefit. (See *Cziraki*, *supra*, 111 Cal.App.4th at p. 563.) We will therefore direct the trial court to modify the fee award accordingly.

### B.

As for Zhu's cross appeal, she contends that the trial court "misapplied the law" when it awarded compensatory damages rather than imposing a constructive trust or ordering disgorgement of profits. We are unpersuaded.

The available remedies for breach of a fiduciary duty include damages as well as the equitable remedies Zhu seeks

15

here, disgorgement and imposition of a constructive trust. (See *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396-399 (*Meister*).) Disgorgement of profits is a remedy that forces a wrongdoer to surrender profits from conscious wrongdoing. (*Id.* at p. 398; see also *County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542-543, as modified on denial of rehg. Jan 25, 2008, as modified Jan. 28, 2008.) " 'A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner.' " (*Meister*, at p. 399.) Both remedies are based on the principle that a wrongdoer should not be permitted to be unjustly enriched at another's expense. (See *id.* at pp. 398-399.)

In the trial court, Zhu's post-trial brief asserted that she was "entitled to" an award of compensatory damages, the disgorgement of profits, "and/or" the imposition of a constructive trust. She argued that she was entitled to damages, as measured by the fair market value of the business that was lost, and that the court "may also award" disgorgement. And she asserted that the imposition of a constructive trust was another available remedy, acknowledging that " '[t]he issue of whether to impose a constructive trust is an equitable issue for the court.' " Zhu did not take the position, as she does in her cross appeal, that disgorgement of profits and the imposition of a constructive trust are required as the only appropriate remedies. Nor did she take that position in her objections to the trial court's tentative statement of decision, or in her post-trial supplemental briefing. As we have explained, a party may not assert an alleged error on appeal that has not been brought to the attention of the trial court. (See *Cabrini Villas*, *supra*, 111 Cal.App.4th at p. 693; *San Mateo Union High School Dist. v. County of San Mateo*, *supra*, 213 Cal.App.4th at p. 436.)

16

Even assuming Zhu has not forfeited the issue, she has failed to meet her burden of demonstrating error. As she concedes, the selection of an appropriate remedy from amongst authorized remedies is a matter entrusted to the trial court's discretion. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 874; see also, e.g., *Center for Healthcare, supra,* 57 Cal.App.5th at p. 1130 ["The trial court possesses substantial discretion to balance the equities and fashion the award it deems appropriate."]; *Meister*, *supra*, 230 Cal.App.4th at p. 401 ["It is up to the trial court to decide if . . . a [constructive] trust is preferable to the other available remedies" for breach of fiduciary duty]; *Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265 ["the propriety of granting equitable relief in a particular case by way of . . . restitution or impressment of a constructive trust[] generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case"].)

Zhu has shown no abuse of discretion by the trial court. Adopting the valuation of Zhu's expert, the trial court awarded damages that would reimburse Y&Y for its fair market value in February 2016, including "the value of the tenant improvements, the right to lease space, [and] generally any goodwill of the corporation." The court reasoned that reimbursing Y&Y for its fair market value was appropriate "in light of the evidence presented in this case." The trial court found that "Zhu and Yang had come to a point in their relationship where they agreed that it would not be reasonable for them to continue in business together" and Yang used her own funds to finance her new business and "did not convert monies from any Y&Y account" for that purpose. Further, the ongoing operation of Yang's new preschool relied on her own childcare expertise, as "Zhu did not have the training or experience to actually operate a preschool." Particularly given the court's finding that the parties had agreed they could no longer continue in business together at the time of

Yang's wrongful actions, it was reasonable for the trial court to conclude that requiring Yang to essentially purchase Y&Y by paying for its fair market value, rather than imposing a constructive trust on, or forcing her to disgorge profits from, her new business, was an appropriate remedy.

## DISPOSITION

The judgment is conditionally vacated and the case is remanded for the trial court to consider Yang's unclean hands defense. If the court concludes that the affirmative defense bars recovery to any extent, then the judgment is reversed and the court shall enter a new judgment in accordance with its findings. If, instead, the trial court rejects the affirmative defense, then the judgment is affirmed except that the attorney fee award shall first be modified to reflect that Zhu's attorney fees are to be paid out of the damages awarded to Y&Y. Each party shall bear its own costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(3), (5).)

BURNS, J.

WE CONCUR:


JACKSON, P. J.
SIMONS, J.

*Yang v. Zhu (A172055, A173090)*
*Yang v. Zhu (A172602)*